# CHARLESTON.

NESTOR v. NESTOR *et als.*

Submitted March 4, 1919.    Decided March 11, 1919.

HABEAS CORPUS—*Custody of Children—Award.*

In a *habeas corpus* proceeding by the wife against the husband for the custody of their three year old child, which the husband forcibly carried away from their home in another state to this state, when no divorce had been obtained nor divorce suit pending in either state, the court is justified in awarding the custody of the child to the mother when the evidence does not show she is morally unfit and does show she is more able to care for it than the father.

Error to Circuit Court, Tucker County.

Habeas corpus by Carrie Nestor against Thurman Nestor and others for the custody of a minor child. From a judgment for plaintiff, defendants bring error.

*Affirmed.*

*J. W. Harman,* for plaintiff in error.
*Chas D. Smith,* for defendants in error.

WILLIAMS, JUDGE:

This writ of error, awarded on the petition of Thurman Nestor and Jasper Nestor, his father, is to a vacation order of the judge of the circuit court of Tucker county, awarding to Carrie Nestor, the wife of said Thurman Nestor, the custody of their three year old son Kenneth Nestor, in a *habeas corpus* proceeding instituted by her. There has been no decree of divorce, and no suit for divorce is pending. The parties were married in Tucker county, West Virginia, in May, 1912, and for some time thereafter continued to reside in said county, living a part of the time on the farm of the husband's father and a part of the time on the farm of the wife's father. They then moved to Canton, Ohio, rented some rooms and did light housekeeping for a while, and later rented a house, and the wife kept boarders and the husband worked and earned from $18 to $27 per week, which, he says, he

turned over to his wife. Apparently they lived together amicably until he began to suspect her of improper relations with one of the boarders by the name of John Larson, and, on two occasions, ordered her to leave the house. The second time he ordered her out, she says, she left and stayed at a hotel that night, secured employment and started to work, but that, in about three days, he came after her and persuaded her to return, which she did, thinking it would be better for the child and themselves. She says he then treated her well until after she had signed his claim of exemption from military duty, and then he again began to mistreat her. He was not feeling well and, she says, she persuaded him to come to his father's home in West Virginia on a vacation. He did so, and remained for ten days or two weeks, returned to Canton about the first of September and went to work for the Sanitary Milk Company and continued working for said company until about the first of October, when he left her and returned to his father's home in West Virginia, bringing the child with him. They are living separate and apart, and he and the child were at his father's when this proceeding was begun. He works on his father's farm, but receives no wages, and when he is at work, he says, his mother takes care of the child. Petitioner swears that, at the time she brought this proceeding, she was earning $10 per week in a restaurant in Canton, is promised $12 per week when she returns and is able to provide for herself and child. He says he brought the child to his father's because she was not a fit person to raise it. He accuses her of infidelity and of communicating to him the gonorrhea. She denies this, and there is no other evidence to prove the fact. His testimony respecting this charge is wholly inconsistent with his conduct, for he thereafter returned to Canton and they cohabited as man and wife for a month before he brought the child to West Virginia. He files a letter, purporting to have been written to his wife by John Larson while he was in a military training camp, which, he says, a friend of his clandestinely procured and sent to him. She denies receiving such a letter. It is not identified as a letter written by Larson, nor is there

any evidence to prove she received it, and, of course, it cannot be read as evidence against her.

The welfare of the child is the guiding principle by which the court must be governed, and although the law recognizes the father as the natural guardian of his infant children, and generally prefers him to the mother as the one entitled to their custody, still this is not an inflexible rule. If the mother is better qualified, morally and physically, than the father to perform the trust, the court may properly entrust the child to her. *Cariens* v. *Cariens,* 50 W. Va. 113; *Dawson* v. *Dawson,* 57 W. Va. 520; and *Buseman* v. *Buseman,* 83 W. Va. 496.

If the testimony of the mother in this case is to be taken as true, the father is not morally fit to raise the child; and, on the other hand, if his testimony is true the mother is equally unfitted for so sacred a responsibility as the proper rearing of a child. But his charges of her immorality are denied by her and are not sustained by him, as he bears the burden of proving them. But her charges against him are, in part at least, admitted by him. He admits he had a loathsome disease, which, generally, originates from immoral habits. True he accuses her of giving him that disease. But she denies it, and there is no other evidence that she ever had such disease.

Furthermore, he has failed utterly to prove his financial ability to provide for the child. He is living with his father and working on his place and admits he is earning no wages. The mother of the child swears she has a good place to live in Canton, Ohio, the place where she and her husband last cohabited, and is earning $10 per week, and can take good care of the child. It also appears that she is the more intellectual of the two, is fond of reading and, therefore, the better qualified to give the child proper mental training.

In view of all these circumstances, the judge was justified in committing the care and custody of the child, Kenneth, to its mother, and we affirm the judgment.

*Affirmed.*