# CHARLESTON.

## ZELL CONNOR v. W. T. HARRIS, *et al.*

(No. 5311)

Submitted October 20, 1925. Decided November 3, 1925.

1. PARENT AND CHILD—*Welfare of Child is to be Regarded More Than Technical Legal Rights of Mother to its Custody.*

   While the mother, where the father is dead, is generally entitled to the custody and control of her infant child, if she is a proper person for the trust, yet the welfare of the child is to be regarded more than the technical legal rights of the parent. (p. 317.)

   (Parent and Child, 29 Cyc. pp. 1587, 1594.)

2. HABEAS CORPUS—*Trial Court Has Discretion as to Custody of Child Which Will Not be Disturbed on Appeal, Except for Abuse Thereof.*

   In habeas corpus for the custody of a child the trial court has a measure of discretion which will not be disturbed on appeal, unless an abuse of sound and reasonable discretion appears. (p. 318.)

   (Habeas Corpus, 29 C. J. §§ 106, 227; Parent and Child, 29 Cyc. pp. 1604, 1605.)

   (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Kanawha County.

Habeas corpus by Zell Connor, relator, against W. T. Harris and wife to obtain custody of the relator's infant daughter. Judgment for respondents, and relator brings error.

*Affirmed.*

*Whitt & Life* and *George P. Stewart,* for plaintiff in error.
*Davis & Painter* and *Joe L. Silverstein,* for defendant in error.

MILLER, JUDGE:

By writ of habeas corpus in the circuit court relator sought to obtain the custody of her infant daughter six years of age. The respondents are the grandfather and grandmother of the child.

From the pleadings and evidence it appears that by a decree of the circuit court, entered September 13, 1920, relator was divorced from her former husband, John D. Harris, the decree providing: "It is further adjudged, ordered and decreed that the care, control and custody of Bulah Elizine Harris, the infant child of these parties, be and the same is hereby awarded to the plaintiff and defendant one-half time each, as follows: Each party shall have the custody of the said child at regular intervals of thirty days, and neither party shall keep the said child for a longer period than thirty days at a time without the written consent of the other party." There appears to have been a previous contract between relator and her husband, by which each of the parties was to have the custody of the child, for alternate periods of six months each. Some time the latter part of August 1920, before the decree of divorce was entered, the father took the child to the home of his parents, with whom he also made his home until his death in July 1924. Relator was married to her present husband, J. B. Connor, in June 1921. Soon after the death of her former husband, relator instituted the present proceeding.

Respondents, for defense to the writ, allege that relator by her conduct has abandoned the child, and is now precluded from asserting any rights she may have had to its custody; that at no time did they or the father of the child by word, act or deed prevent or attempt to prevent relator from having the care, control and custody of her daughter as provided in the decree of divorce; that only once before the death of the father did she come to their home to see the child, and that she then took little interest in it, speaking to it in a very casual manner, and leaving after a brief visit without even suggesting that she desired to take it into her care and custody; that upon the death of the father he named his father, the respondent W. T. Harris, executor of his will, and devised to his daughter all of his property, and by the will made his father guardian of the child; and that they have always given their granddaughter the same care, protection and maintenance, and bestowed upon her the same affection they would if she were their own child, and are willing and anxious to do so, and to comply fully with their son's wishes and the letter and spirit of his will.

As excuse for her conduct relator testified that her former husband was a man of such temper that she feared him, before and after their separation, and that he sent word to her by her uncle that he would kill her if she came around where the child was, unless she would take him and their daughter both back and live with them. Mr. George P. Stewart, relator's uncle and associate counsel for her in this proceeding, testified that at some time, he did not remember just when, but the first time he saw Harris, after the child was taken to the home of its grandparents, Harris told him he did not want relator about his home, and that before he would have her coming around, he would kill her. The witness does not say that this remark was to be communicated to relator, nor that he did communicate it to her. From his testimony and that of relator, it would appear that this conversation occurred before the divorce decree was entered. This is the only evidence of threats; and there is no other evidence that Harris

refused to carry out the terms of the decree of divorce between him and relator.

Relator's present husband testified that soon after his marriage to her, he and she considered taking the child: he says: "I talked it over with her, and told her I would be tickled to death to have the child, but I didn't want him (the child's father) coming to my house to see the child, which he had a right to do, the way the divorce was granted, if she was keeping the child. So I talked it over with my friends, and they said if the child was in a good Christian home to leave it there until he got married, or things got more convenient for us to get the child; so we thought it would be better to let the child stay there until we had a right to have the child all the time." Relator knew where the little girl was being cared for by its grandparents, which for a part of the time was only a few blocks distant from her own home, and admits she made but one visit to see it between August 1920 and some time in the month of July 1924, that one visit being in October 1923. She testified that she wrote a time or two to inquire about her daughter, while the grandparents were living out in the country, and received answers to her letters saying she was all right; and after that she did not write again. Respondents testified that when relator came to their home, she paid little attention to the child—did not kiss it or take it in her arms; and that she remained but a short time.

It appears that the child has always been well cared for in the home of respondents, and was kept in school. The grandfather and grandmother avow their affection for the little girl, as well as does one of its aunts, living in the home of her parents, the respondents; and all say that they earnestly desire to keep her, and will provide for her as if she were their own daughter. The evidence tends to prove the good character and reputation of each of the parties to the proceeding; and it does not appear that either of them are not financially able to care for the child.

Upon the pleadings and evidence the circuit court was of opinion that the best interests of the child would be promoted by permitting the respondents to retain possession and control

of her, until the further order of the court, and discharge the writ theretofore awarded.

While it is unquestionably true that where the father is dead, the mother, if she is a proper person for the trust, is generally entitled to the custody and control of her infant child, we must not lose sight of the rule that obtains in most jurisdictions at the present day, that the welfare of the child is to be regarded more than the technical legal rights of the parent. *Green* v. *Campbell,* 35 W. Va. 699; *Cunningham* v. *Barnes,* 37 W. Va. 746; *Cariens* v. *Cariens,* 50 W. Va. 113; *Dawson* v. *Dawson,* 57 W. Va. 520; *Buseman* v. *Buseman,* 83 W. Va. 496; *Nestor* v. *Nestor,* 83 W. Va. 590; *Boos* v. *Boos,* 93 W. Va. 727; 1 Bailey on Habeas Corpus, sec. 151; 1 Schouler on Domestic Relations, (6th ed.) sec. 744; Re Pryse, 75 Kans. 556, 41 L. R. A. (N. S.) 564, note p. 570. The cases and texts cited fully cover the questions raised, and we do not deem it necessary here to discuss this proposition further. In *Cunningham* v. *Barnes,* it was held: ''The welfare of the child is the pole-star by which the discretion of the court is to be guided; but the legal rights of the parents will be respected, being founded in nature and wisdom, unless they have been transferred or abandoned.''

It is said that there is no evidence in this case tending to show that relator abandoned her daughter to the respondents, and that she only left it with the father while he was living, and demanded it soon after his death; but the evidence leans strongly toward the conclusion that she did not exhibit that parental love and affection for her infant daughter which would warrant the court in taking it from those who have cared for it for more than four years and entrusting it to her care and custody, when there was nothing to show that its welfare justified the changed conditions which would follow. Even if relator did fear her husband, there was nothing to prevent her making inquiry about the child; but her own testimony shows that she inquired by letter but once or twice in four years, and that she made but one visit to see it in that time. She says she was treated kindly by respondents and their daughter when she visited them; and it does not appear

that her former husband made any threats following her visit to his parents, though he lived for almost a year thereafter. It is to be readily understood, and there is some evidence to the effect, that there was not a kindly feeling between relator's present and former husbands; but that should not stand in the way of a mother exhibiting an interest in her infant daughter.

The evidence that Harris refused to conform to the provisions of the decree of divorce is not convincing. If the mother was a proper person to have the custody of her child, the time that its welfare demanded her attention was in its most tender years, soon after the divorce decree was entered. And there is little, if any, evidence of effort on her part to secure the child at that time, though she always had legal right to it, and this under the protection of the court entering the decree. The decree was in full force and effect all that time.

And because it is a difficult question for the court, in many instances, to determine what the actual welfare of the child demands, a question of extreme delicacy and of no little embarrassment and responsibility, much must be left to the sound and reasonable discretion of the trial court, who has before him all the parties in interest, and hears their testimony and that of the other witnesses, and who by looking into their faces and observing their demeanor, can better determine the conditions and environment under which the child is living, and the possible effect a change its surroundings may have on its life, than the appellate court can from the printed record before them. Here all the parties in interest testified orally before the court, and he had opportunity to observe critically their attitude towards the child, and which of them manifested a true affection for her, and was thus placed in a position to decide whether or not the interests of the child would be benefited, or as well preserved, by the change of environment proposed; and from the record before us we can not say his judgment was erroneous.

It is said that the grandfather and grandmother, seventy-two and sixty-seven years of age respectively, are growing old

and may not be able for a great number of years to care and provide for the child, while the mother is but twenty-five years old, and the stepfather twenty-eight; but the order of the trial court only directed that respondents retain custody of the child until the further order of the court. At any time it may be made to appear to the court that the welfare of the child demands a change of environment, or that the same is advisable, the court in his discretion may act accordingly.

The judgment of the circuit court will be affirmed.

*Affirmed.*