# CHARLESTON.

PHYLLIS PIERCE v. T. E. JEFFRIES et al.

(No. 5708)

Submitted March 15, 1927.   Decided March 22, 1927.

HABEAS CORPUS—BASTARDS—*Mother of Illegitimate Child, Not Abandoning it or Parting With Custody, Can Recover it From Strangers Who Acquired Possession Without Her Knowledge.*

Where the mother of an illegitimate child has not abandoned it, nor by contract express or implied parted with its custody and care, she can recover it by habeas corpus from strangers who have acquired its possession without her knowledge, it not being shown that she is unfit to have its custody and control, and it being shown that her parents who are of high moral character and standing and who are possessed of a reasonable amount of worldly goods for its maintenance and support, assisted by the mother, are willing and desirous of taking it into their home to rear and educate.

(Bastards, 7 C. J. § 28.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Braxton County.

Habeas corpus by Phyllis Pierce against T. E. Jeffries and another, to recover the custody of a child. Judgment for defendants, and the relator brings error.

*Reversed; custody awarded here.*

*L. H. Barnett,* for plaintiff in error.
*James E. Cutlip* and *Van B. Hall,* for defendants in error.

LIVELY, JUDGE:

This writ of error was awarded to a judgment of the circuit court denying Phyllis Pierce the relief sought by her in a habeas corpus proceeding to recover the custody of her infant son.

The relator, Phyllis Pierce, a young woman 23 years of age, was married in 1920, to Everett Roger Pierce, in St. Louis, Missouri, but for the past few years she has been living apart from her husband. Before separating from him, she became

the mother of a boy, now four years of age. Relator is the daughter of Rev. J. B. Carder (a retired minister) and his wife May Carder, who reside in the small town of Burnsville, West Virginia. During the latter part of December, 1924, relator, who had been staying with her parents, went to Clarksburg, West Virginia, where several weeks later she gave birth to a baby boy, at a hospital in that city. Her mother and father did not know that she was expecting a child. She obtained a position as telephone operator, and secured a nurse for her baby, who took care of it while the mother worked, until she (the nurse) moved away from the city. Being unable to obtain another nurse, she conceived the plan of taking the child to Burnsville and secretly leaving it with her parents; and then after they had become attached to it, to confess parenthood, and seek their forgiveness for the shame she had brought upon their name. In furtherance of this plan, she took a night train out of Clarksburg, on April 4, 1925, and brought her child to Burnsville, arriving there about 4:00 o'clock in the morning. She went to the rear of her parents' home and placed the baby, which was in a basket, near the windows of her parents' sleeping room. She then concealed herself. The baby began to cry, and after seeing her father take the child into the house, she left town unobserved, and went back to Clarksburg. The baby was warmly wrapped in the basket, which contained some of the child's clothing, a small amount of money and some food. A note was also placed therein, telling the finder to keep the baby until called for, and that the child's name was "Bobby". This note was written for the relator by a woman in Clarksburg. The father and mother being unaware of the identity of the infant, consented to its passing into the hands of neighbors, and it came into the possession of the defendants to this proceeding, T. E. Jeffries and his wife Bird Jeffries, about two or three days after it had been left with the parents, who have had the custody of it since that time, and who have expressed a desire to adopt the child as their own.

About two or three weeks after this event took place, a justice of the peace at Burnsville, Rucks by name, went to

Clarksburg armed with a warrant for the relator's arrest, for
what crime it does not appear. This warrant was not based
upon sworn complaint. Rucks told the relator that he had a
warrant for her arrest, and asked her if she was the mother
of the child, which was then in the hands of the Jeffries. She
denied motherhood, but admitted that she had brought it to
her father's home. She said that it was the child of her brother
by a girl in Ohio. At this time neither of the relator's pa-
rents knew that she was the mother of the child.

The information received from the justice of the peace that
the baby was in the hands of the Jeffries was the first knowl-
edge relator had of the fact that her baby had passed into
the custody of strangers. Shortly after this she took steps
to regain the custody of her baby, as a result of which, Mr.
Jeffries, at his wife's request, came to see relator at Clarks-
burg in an endeavor to secure her consent to their retaining
possession of the child. She refused to assent. Finally, on
Mr. Jeffries' last visit to Clarksburg, he informed her that
he and his wife had decided to surrender the baby to her. A
day was set for the relator to come to Burnsville for her child,
and she arrived on the appointed day. Mrs. Jeffries felt that
she could not give the child up, and in reply to the relator's
entreaties that she do so, Mrs. Jeffries told her to come the
next morning and they would let her know definitely what
their decision would be. The next morning relator was in-
formed by Mrs. Jeffries that they had decided to keep her
baby, and a little later Mr. Jeffries told the Rev. Carder that,
"if he got the baby they would have to get it through the
courts." Thereupon, relator instituted this habeas corpus
proceeding; and upon the pleadings filed therein and the evi-
dence introduced, the trial court entered the judgment com-
plained of, adjudging that respondents retain the custody of
Robert Pierce until the further order of the court.

The relator is employed as a Bell telephone operator in
Clarksburg. She says that it is her intention, if she is awarded
the custody of the child, to arrange for it to be kept by her
parents, with her aid and assistance. The parents are willing
to keep the child and care for it. They own two tracts of land

near Burnsville, one of 60 acres, another of 61 acres, a large
portion of one of these tracts is farmed by the relator's father,
a retired minister, a man 60 years of age and apparently in
good health.   They also own their home at Burnsville, al-
though $800.00 purchase money is still due on this property.
They had been living in this house at Burnsville for about
nine months, at the time this case was tried.   The parents
have a cash income of about $700.00 a year derived from gas
well rentals and from the father's pension as a retired min-
ister.   Besides this they have the crops produced on their
farm.   There is considerable timber on one of the tracts men-
tioned above, and the Rev. Carder says that he intends to cut
and manufacture it.   In addition to the four-year old child
of the relator, her parents have living with them their son,
24 years old, and their daughter, 16 years of age.

The defendant T. E. Jeffries is about 56 years of age, and
his wife is 36.   He has no children of his own, but Mrs. Jef-
fries has a married daughter.   Mr. Jeffries has been engaged
in numerous business enterprises during the years he has
lived in Burnsville, the last of which was his hotel business,
but just before the hearing of this case, the hotel which he
owned and ran, was destroyed by fire, and so at that time
(July, 1925), he was not engaged in any business.   His plans
were uncertain, he not being sure whether he cared to venture
forth again in a business enterprise in Burnsville, or whether
he would go to Ashland, Kentucky.   Mr. Jeffries owns real
estate in Burnsville valued at about $7,600.00, while his debts
amount to more than $8,000.00, a part of which is represented
by purchase money due on the hotel property.   This last men-
tioned property was insured for $6,500.00.   So, when he col-
lects that amount from the insurance company, his assets
would be about $6,000.00 in excess of his liabilities.

In determining whether the circuit court erred in award-
ing the custody of relator's infant child to the respondents, it
may be well to observe some fundamental principles under-
lying cases of this character.   First.   It is well settled in this
state that the welfare of the child is of paramount importance
in determining who is entitled to its custody, and that the

welfare of the child is to be regarded more than the technical rights of the parent. *Connor* v.·*Harris,* 100 W. Va. 317. Yet, even though the welfare of the infant is the "polar star" by which the discretion of the court is to be guided, "the legal rights of the parent will be respected, being founded in nature and wisdom, *unless they have been transferred or abandoned."* *Cunningham* v. *Barnes,* 37 W. Va. 746. Second. The mother of an illegitimate child is entitled to its custody unless she be unfit therefor. And the same rule as to the custody of legitimate children is applied to the custody of illegitimate children, and the courts are controlled and actuated by the same considerations. Vol. 1, Bailey on Habeas Corpus, Sec. 155, page 613. And third. In the absence of evidence of abandonment or transfer of his rights, a natural parent "who is of good character and a proper person to have the custody of the child and reasonably able to provide for it is entitled to the custody as against other persons, although such others are much attached to the child, and the child is attached to them, and prefers to remain with them,' and they are in all respects suitable to have the custody of the child and able to support and care for it, and even though they are of larger fortune or able to provide for the child more comfortably than the parent, or to care for it better, or to give it a better education than the parent can afford." 29 Cyc. page 1590.

Bearing these fundamental principles in mind, let us pass to the controlling question in this case, namely; does the evidence establish the loss by abandonment of the relator's parental right to the custody of her infant son? We believe the question should be answered in the negative. It may be true that relator showed a rather deplorable lack of courage in leaving her baby boy at the home of her parents in the manner described, instead of facing them and admitting her shame. Yet, we should not be too critical of this unfortunate girl; for after all, she was quite young, only 22 years of age, and it is difficult sometimes to face loved ones and the world and admit that one has erred. This is especially true in cases of this kind, towards which the world, justifiably or unjustifiably, has taken a harsh and unyielding stand. Then again, it is

difficult to picture a more severe punishment than to compel a woman who wears a "scarlet letter" upon her breast to face the judgment of a small town. And so there were perhaps some extenuating circumstances which tend in a measure to explain relator's state of mind and to justify her actions at the time this event took place. After her boy's birth, she took good care of him; and out of her wages as a telephone operator employed a nurse to care for him. The fact that she left the baby at the home of her parents was indicative of her intent not to abandon the child. For if this had been her intention, she need never have made the trip to Burnsville. However, she evidently did not anticipate that her parents might consent to the child's passing into the hands of strangers, they not realizing that the baby was of their own flesh and blood. Another fact tending to negative abandonment on her part is, that shortly after she learned that the baby had passed into the hands of strangers, she promptly took steps to recover it. It is true that her conduct when confronted by the justice of the peace (even though he was armed with an illegal warrant), was probably reprehensible, but this may be explained perhaps by the fear of arrest and the consequent shame and distress to herself and parents. Her subsequent conduct would tend to negative the fact that by her conduct at that time she meant to abandon her boy. She promptly instituted this suit, when denied the custody of her child, and vigorously prosecuted it in the lower court and in this court. The evidence fails to establish abandonment by the relator. And this being true, she stands in the place of any parent, whose parental rights have not been waived by abandonment or by contract, seeking to recover the custody of his or her child.

There is no evidence that the relator is unfit to have the custody of her baby. It is true that the relator may have erred prior to the birth of her child. She may have trusted too much or loved too well. But, be that as it may, there is not a scintilla of evidence in the record as to any subsequent misconduct on her part which would convict her of being an unfit person to have the custody of her boy. In order to separate a child from its parent on the ground of the latter's

unfitness, there must be cogent and convincing proof of such fact. As has been well said in the case of *Ex Parte Davidge,* 72 S. C. 16, 51 S. E. 269: "To separate a child from its parents is therefore, in a very strong measure justified only by convincing proof of the parent's unfitness. No inflexible rule can be laid down by which unfitness may be determined. Each case must be decided on its own particular facts. . . . The condition in life, or the character and habits of the parent must be shown to be such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at his hands." There is nothing in the record to indicate that the child will not receive that care and comfort, and moral and intellectual training which is common to that condition in life to which it has been born. A number of witnesses, citizens of Burnsville, who had known the Jeffries for many years, and had known the Carders and the relator but a few months (the latter persons have only recently moved to Burnsville), testified that in their judgment the child would be better off if left in the custody of the Jeffries. But the evidence of these witnesses disclosed that they knew little or nothing about the relator and her parents. None of them gave the facts on which they based their opinions. Their opinion evidence is of very little weight. But even if it be admitted that financially the respondents are somewhat better off than the relator and her parents with whom the child will be left, and that Mrs. Jeffries will be in a position to give it a greater degree of care and attention than its grandparents and its mother will be able to furnish it, these facts alone are not sufficient to deprive the natural parent of the custody of her child as against a stranger, in the absence of any evidence of unfitness on her part, or of any abandonment of the child or transfer of its custody. 25 Cyc. page 1590; *Cunningham* v. *Barnes,* 37 W. Va. 746; *In Re Mead,* 194 Pac. (Wash.) 807; *Watts* v. *Smylie,* 76 So. (Miss.) 684; *Cormack* v. *Marshall,* 211 Ill. 519; *Hedtke* v. *Kukuk,* 220 Pac. (Okla.) 615; *Ex Parte Gille,* 224 Pac. (Cal.) 784; *Ex Parte Archer,* 253 S. W. (Mo.) 1095.

We do not doubt that Mr. and Mrs. Jeffries, the latter particularly, have formed a warm attachment for the child, and that it has found a place in their hearts, but we do not think the record discloses such a case as would warrant a court in depriving the relator of the custody of her baby. She, too, loves the child, and her affection is that of a mother, the strength and depth of whose love cannot be told in words. Such love has filled the world with memorials of great things done and suffered. Only she who has gone down into the valley of the shadow of death that her baby might be born possesses such a love, often so unreasoning and inexplicable as to pass all understanding. It is true that for the present the boy will be left a large part of the time with its grandparents, but the young mother will have access to it, and no doubt it will be the recipient of her mother love, and all the material advantages in her power to give. In the meantime it will have the loving care of its grandparents, who have sworn that they will gladly take it into their home and hearts.

The judgment will be reversed, and an order giving the relator the custody of the child entered here.

*Reversed; custody awarded here.*