STATE *ex rel.* CHESTER M. BENNETT, *et al.*

*v.*

MERL ANDERSON, *et al.*

(No. 9808)

Submitted September 24, 1946. Decided December 21, 1946.

*W. A. Thornhill, Jr.,* and *Ashworth* and *Sanders,* for plaintiffs in error.

*Jno. Q. Hutchinson,* for defendants in error.

KENNA, PRESIDENT:

This proceeding in habeas corpus was brought in the Circuit Court of Raleigh County by the State at the relation of Chester M. Bennett and Sarah A. Bennett against Merl Anderson and Elmer Anderson for the purpose of recovering the custody of Merlene Brady, the eleven year old illegitimate daughter of Merl Anderson, and from a judgment in favor of the petitioners and against Merl Anderson and Elmer Anderson, her husband, this appeal was granted the respondents. There

is very little controversy of fact, the only material issue seeming to be whether Merl Anderson had verbally given her daughter to Mrs. Bennett, with whom the daughter was then living.

In the year 1935 the Bennetts, then and now living at Beaver, Raleigh County, in a modern air-conditioned eight room residence and comfortably well to do, saw an advertisement in a periodical called "Market Bulletin" to the effect that a woman with an infant daughter living at Dundon, Clay County, desired a home. After a brief correspondence the Bennetts went to Dundon and there saw Merl Brady and her seven or eight months old daughter. From Dundon they visited the home of Merl Brady's parents in Braxton County, she being then in the neighborhood of seventeen years of age. Having made satisfactory arrangements, they took the mother and child to their home in Beaver, the mother to help in the house work and to receive room and board for herself and child without any regular pay. The arrangement seemed to work very satisfactorily, none of the persons involved being dissatisfied, the Bennetts treating the Brady child as their own and caring for it in every conceivable way.

Bennett was a C. & O. brakeman earning about $2,-500.00 per year and Mrs. Bennett taught school, making their combined earnings between $4,000.00 and $4,500.00 per year. They were worth in the neighborhood of $40,-000.00, and had no children, having married several years before 1935, the actual date of their marriage not appearing in this record.

In 1938, when the child was about four years of age, Merl Brady married Elmer Anderson. They were married in September and she left the Bennett home the latter part of October. The record is not clear as to where they lived the first year of their married life but they seem to have spent the greater part of that year at Red Star in Fayette County, after that settling on Anderson's deceased father's place in which Anderson owned an undivided interest. With the help of the Ben-

netts they had built a three room frame cottage with no plumbing nor toilet, using an out-house jointly with a neighbor. Here three children were born to them, the oldest of whom is now about seven years of age. When proof was taken, they were using two beds for six persons when Merlene stayed with them. The house doubtless will be allotted to them when Anderson's father's farm is partitioned.

After her marriage Mrs. Anderson left Merlene Brady at the Bennett home where she was provided with her own room, went regularly to school and Sunday School, stood well in her classes, and lived generally as a well cared for daughter. Her mother, whose home was not far away, made frequent visits and took her occasionally to the Anderson home with the permission of the Bennetts. On one of these occasions, in August, 1945, Mrs. Anderson was at the Bennett home at suppertime and asked Mrs. Bennett if Merlene could go home with her to milk. She was told that she could, and it was agreed that Merlene would return at about eleven o'clock. That she did not do. Mrs. Anderson stated that that evening she started to bring Merlene back to the Bennett home and that the child told her on the way that she would much rather stay with her. For that reason she did not take Merlene back but turned her car and went to her own home. She went to the Bennett home the next day and informed the Bennetts that it was her purpose to keep her daughter.

Mrs. Bennett states that a short while before the marriage of Merl Brady in discussing her plans for the immediate future she told Mrs. Bennett that she could not take the baby back to her mother and that upon being told that if she gave it to her, Mrs. Bennett, she would take care of it, she agreed to do so. Her subsequent marriage, leaving Merlene in the Bennett home for around seven years and the fact that in the meantime she has given birth to three other children is confirmatory of this verbal understanding.

.   In a habeas corpus proceeding involving the custody of a child the decision of a lower court will not be disturbed here unless an abuse of sound and reasonable discretion appears from the record on appeal. *Connor* v. *Harris,* 100 W. Va. 313, 130 S. E. 281. The welfare of the child controls and since that welfare is not only its material well being, but rests largely upon the manner and spirit with which its young life is cultivated, the court having the more intimate opportunity to observe, should reach, and does reach, a more sound conclusion than that of a court influenced only by printed pages. We are of the opinion that the order of the Circuit Court of Raleigh County shows no abuse of sound and reasonable discretion and therefore must be affirmed.

The respondents below, appellants here, in the main depend upon the case of *Pierce* v. *Jeffries,* 103 W. Va. 410, 137 S. E. 651, which holds that the mother of an illegitimate child who has not abandoned it, nor by contract, express or implied, parted with its custody and care, may recover its possession in habeas corpus. The circumstances of the *Pierce* case were exceptionally dramatic. A young woman of twenty-three left the home of her father, who was not conscious of her condition, and went to Clarksburg for the purpose of giving birth to a baby. After the birth of the baby she procured a position in Clarksburg and employed a nurse to care for it. She lost the nurse and decided that she would secretly leave the child on her father's doorstep. This she did but her parents, ignorant of the child's identity, arranged for the child to live with neighbors. The mother had returned to Clarksburg and did not learn that her parents were not caring for her baby for several weeks. When she did, she brought habeas corpus and this Court reversed a judgment denying her relief. The difference in the circumstances in the case at bar and those of the *Pierce* case is quite apparent. Under the principle there laid down we believe that the judgment of the lower court should be sustained because the relators contend and testify that Mrs. Anderson had agreed to give them

the child immediately prior to her marriage. This she denies. Issues of fact are to be decided here so that the finding of the lower court will be sustained unless doing so is against a clear preponderance of the testimony. Here we do not believe that it is.

As to the welare of the child, considering only its material aspects as shown by this record, we believe it is quite clear that Mr. and Mrs. Bennett are and will be in a position to do much more for it than Mr. and Mrs. Anderson. A detailed comparison would seem rather harsh and believing that we are dealing with feelings of some delicacy on both sides of this record, we do not wish to comment other than to say we do not believe that the trial judge was unduly influenced by this element of the case.

For the foregoing reasons the order of the Circuit Court of Raleigh County is affirmed.

*Affirmed.*

LOVINS, JUDGE, dissenting:

I respectfully dissent from the conclusion reached by the majority of the Court in this case, and now undertake to state my reasons for such dissent.

Under the long established rule in this State the determination of the custody of an infant rests primarily on the welfare of the infant; and such welfare is the governing and paramount factor. *Frame* v. *Wehn,* 120 W. Va. 208, 197 S. E. 524; *Arnold* v. *Arnold,* 112 W. Va. 481, 164 S. E. 850; *Reynolds* v. *Reynolds,* 109 W. Va. 513, 155 S. E. 652. Many other decisions attest the uniform adherence of this Court to that principle. Mindful of that rule there are other elements which bear on the rights of the litigants in this proceeding. I do not consider the right of a parent to the custody of offspring as being solely technical. It is a natural right which arises from the very instinct of a normal parent. That right has also been accorded statutory recognition, in language reading as follows: " * * * if living together, the

father and mother shall be the joint guardians of the person of their minor child or children, with equal powers, rights and duties in respect to the custody * * * of such minor child or children * * *." Code, 44-10-7. The right has also been defined in judicial utterances as "being founded in nature and wisdom", and will be respected if not transferred or abandoned by the parent. *Cunningham* v. *Barnes*, 37 W. Va. 746, 17 S. E. 308. *Straughan* v. *Straughan*, 115 W. Va. 639, 177 S. E. 771; *Settle* v. *Settle*, 117 W. Va. 476, 185 S. E. 859. It is well established that relators have more of this world's goods than respondents, the mother and stepfather of the child. But that is not controlling. " 'The question is not which of the two claimants can surround the infant with greater luxury, or which of the two will be able to give or bequeath him the greater amount of money or property, but by which of them is he likely to be reared and trained so as to make him the better man and the better citizen. ' " *Arnold* v. *Arnold, supra.*

If a child concerning whose custody there is a controversy is of the age of discretion, weight should be given to the wishes of the child. *Hurley* v. *Hurley*, 71 W. Va. 269, 272, 76 S. E. 438.

Giving the utmost consideration to the welfare of the child in this proceeding, by the decision of this Court she is taken from the custody of her mother and the companionship of her brothers and sister, and is committed to the care of persons who are not her blood kin. A court should not exercise authority to take a child of tender years from its mother, particularly a female child, unless there are "the most cogent reasons" for such action. *Reynolds* v. *Reynolds, supra.* It may be that the Bennetts will be able to give the child better advantages from a material standpoint, but that is not all that goes to make up a well-rounded life. The normal and usual childhood of association with brothers, sisters and the mother is more desirable than the fleeting chance of presently enjoying material benefits, and the possibility of future advantages.

The child whose custody is in issue is apparently a person of intelligence and undoubtedly possesses a certain amount of discretion. She testified that she desires to stay with her mother, but the trial court and this Court disregarded her wishes. I do not mean to say that the desires of a child eleven years old are controlling but they certainly are an element for consideration by the Court. The only fact bearing on the welfare of the child is that Mr. and Mrs. Bennett have a better home and more property than the mother and stepfather of the child. It would amount to speculation to say that if the child is permitted to remain in the custody of her mother, her physical and moral development would be retarded. Over and above physical and material advantages in life, I think that a human being should be accorded an opportunity to live normally and in associaton with natural kin. The majority opinion in this case denies this little girl that privilege, and the benefit of a normal upbringing.

I am aware that the discretion of a trial court is not to be disturbed in deciding the custody of an infant unless there is an abuse thereof. In this proceeding I think the trial court's discretion was clearly abused, and, giving full weight to the welfare of the child, its desire to live with its mother, the physical surroundings of its stepfather and mother's home and their lack of property, the child's association with her brothers and sister, I believe that her welfare would be promoted and that her chances for becoming a good citizen would be enhanced by allowing the mother to retain her custody. The advantage of living in the Bennett home or the expenditure of money by the Bennetts in rearing this child, will not repay the child for being deprived of the right to be with and associate with her mother.

There is another factor involved with respect to the relinquishment by the child's mother of her right to its custody.

It is shown by the record that there was a vague and indefinite arrangement for the child to remain with the

Bennetts, which does not, in my opinion, constitute an abandonment of the child or a relinquishment by the mother of the right to the custody of the child. The abandonment of a child by a normal parent is so unusual and, I may say, unnatural, that it requires clear and convincing proof.

The record does not disclose that the Bennetts have adopted or will ever adopt the child. As the matter now stands, they may at any time before it reaches its majority cease to help it or discontinue their present care and custody. Should this occur, what would become of the welfare of the child, if it should not return to its mother as it now wishes to do, but which, under the holding of the majority, it may not do at this time? Such an uncertain immediate future is not conducive to the welfare of the child, which, as stated, is the controlling guide in all cases of this type. Under the decision of the majority, the child, not having been adopted by the Bennetts, does not have the protection of permanent care and support or the right of inheritance from its present custodians, who are free from any legal obligation to continue its status whenever they may conclude that they do not care to continue the present arrangement, whereas, if the child were awarded to its mother, as I think should be done, she would be subject to the obligation which the law imposes upon a parent to provide and care for her child.

Although the child was born out of wedlock, nothing appears in this record to show that the mother of the child has since been guilty of any indiscretion or misconduct. So far as can be ascertained, she is an upright person, loving her child and desiring to give her such advantages as she is able to afford, and without dispute the record shows that the stepfather is willing to assist the mother of this child in rearing it.

Petitioners, no doubt, are estimable people, but it is well to bear in mind that they are forty-five and sixty-one years of age, respectively, and that this child is about eleven years old, and that when the child attains

her majority they will be comparatively aged persons. In the meantime the vicissitudes of life may deprive them of their property. Petitioners now have custody of the child and the moral, but not legal, duty to support and maintain it. But their right is not founded on blood and natural affection, but simply on a legal right. The child's welfare, the parent's right and natural feeling support the view that in this case the child would suffer no disadvantage by remaining in the custody of her parent, and that she will suffer disadvantage by being forced to go to the home of the Bennetts, who are not related to the child by blood. The longing of this child for her mother and the association of her brothers and sister will not be assuaged by any material benefits that the Bennetts may confer upon her. In the absence of any unfitness on the part of the mother of the child, and no relinquishment by her of the right to the custody of her child being clearly shown, the financial benefits which the child may derive from living with and in the custody of petitioners are not sufficient reason for depriving the natural parent of the custody of her child and giving it to persons who are not related to it. *Pierce* v. *Jeffries,* 103 W. Va. 410, 137 S. E. 651.

I have no doubt that petitioners love the child, and that their affection is deep and lasting. But so does Mrs. Anderson, the mother, love her child. Who can measure, explain or describe the love of a mother for her children? Suffice it to say that it is so full and lasting as to be, in most cases, a permanent guarantee of the welfare of the child.

For the reasons herein stated, I would reverse the judgment of the Circuit Court of Raleigh County.

I am authorized to say that Judge Haymond concurs in the views herein expressed.