## Richmond

COMMONWEALTH OF VIRGINIA, ET AL. V.
GEORGE HAYES, JR.

June 10, 1974.

Record No. 730974.

Present, All the Justices.

*John E. Greenbacker, Jr., Assistant Commonwealth's Attorney for the City of Alexandria* (*H. Bradley Evans, Jr.; William Cowhig, Commonwealth's Attorney for the City of Alexandria,* on brief), for plaintiffs in error.

*Christopher K. Speed,* for defendant in error.

*Gammiel G. Poindexter* (*Greene & Poindexter,* on *amicus curiae* brief), for William T. Taylor, et al.

Carrico, J., delivered the opinion of the court.

This case involves the custody of an illegitimate female child who, shortly after her birth, was placed, with her mother's consent, for adoption. In an unusual development occurring after the adoption placement, the putative father claimed custody of the child. In the finale of the ensuing contest, the trial court awarded custody to the father. We awarded a writ of error to the Department of Social Services of the City of Alexandria, the agency that arranged the adoption, and to the child's guardian *ad litem*. In addition, we permitted the proposed adoptive parents to participate in the appeal as *amici curiae*.

The record shows that the child, Anita Ferguson, was born out of wedlock to Annabel Ferguson, then 19 years of age, and

George Hayes, Jr., then 17 years of age. Earlier, when the mother learned she was pregnant, she informed Hayes that she was expecting his child and "asked him if he would help . . . to support it." His reaction was that he "didn't really care" and he "just stopped coming around." The expectant mother then decided that adoption "seemed [the] proper thing to do." She contacted the Department of Social Services of the City of Alexandria, and a social worker from that agency counseled her during her pregnancy.

Anita was born May 2, 1972. A few days after the birth, the mother signed an agreement permanently entrusting the child to the Department of Social Services. The child was released from the hospital to a representative of the Department and was temporarily placed in a "pre-adoption foster home." Later, in December, 1972, Anita was placed with the proposed adoptive parents in their home in the Petersburg area. Although the record is silent on the subject, apparently no petition for adoption has yet been filed.

Meantime, in February, 1973, the Department learned of the decision in *Stanley* v. *Illinois*, 405 U.S. 645 (1972), which dealt with the rights of unwed fathers. Prompted by the *Stanley* decision, the Department, in March, 1973, contacted Hayes, the putative father of the child involved in the present case. He was asked to sign an agreement which would have permitted the child's proposed adoption. He refused, stating that "he wanted what was his."

In May, 1973, a representative of the Department of Social Services filed in the Juvenile and Domestic Relations Court of the City of Alexandria a petition alleging a dispute over Anita's custody. In July, 1973, a hearing was held on the petition. The putative father was present at the hearing, pursuant to notice, and was represented by counsel. The court, ruling that it would be in Anita's best interests to separate her permanently from her natural mother and putative father, awarded custody to the Department of Social Services for permanent placement for adoption.

Hayes appealed the Juvenile Court order to the Circuit Court. In a *de novo* hearing, the Circuit Court ruled that Hayes was entitled to Anita's custody, and ordered her immediate transfer to him. The transfer order was later stayed to permit an appeal

to this court. Anita has continued to live with the proposed adoptive parents throughout these proceedings.

The sole question for decision is whether the trial court erred in awarding custody of Anita to Hayes, the putative father. Essential to resolution of this question is an understanding of the import of *Stanley* v. *Illinois, supra,* upon which the trial court relied in awarding custody.

*Stanley* involved a situation where the mother and father had lived together out of wedlock for a period of 18 years. Their relationship produced three children, two of whom were the subjects of the custody dispute before the court. Although the Supreme Court's opinion described the parents' relationship as "intermittent," it is apparent that there was some semblance of a family unit. In fact, the two children whose custody was challenged had lived with the father all their lives and he had supported them. 405 U.S. at 650, n. 4.

Under Illinois statutes in effect at the time, the infant children of an unwed mother were, upon her death, declared dependents and became wards of the state without any hearing on parental fitness of the father and without proof of neglect. In addition, Illinois law presumed the unfitness of the putative father in such a situation.

Mrs. Stanley died and, in a dependency proceeding instituted by the state, the two children involved were declared wards of the state and placed with court-appointed guardians. The father appealed, attacking the Illinois statutory scheme on constitutional grounds. The Illinois Supreme Court, holding that an unwed father could properly be separated from his children upon mere proof that he and the deceased mother had not been married, rejected the father's attack. The United States Supreme Court reversed, holding that the father "was entitled to a hearing on his fitness as a parent before his children were taken from him." 405 U.S. at 649. The Court further held that the Illinois presumption of unfitness of unwed fathers was a denial of due process of law. 405 U.S. at 656-57.

In the present case, the trial judge apparently was of opinion that *Stanley* compelled not only a hearing upon the fitness of the putative father but also the award of custody to the father upon his demand. This is evident from the judge's oral opinion. The judge, after stating that the father had been "guilty of anti-social, immoral and illegal conduct," asked, "why then is he

entitled to his child?" The judge answered his own query by saying, with obvious reference to *Stanley*, "the supreme court has said he is entitled to the child [and] I am going to give the child to the father." Thus, it is apparent that *Stanley* was misinterpreted and consequently misapplied by the trial court.

*Stanley* is not, in our opinion, applicable to the present case. First, and of singular importance, the mother in *Stanley* had died, thereby invoking application of the law concerning the status of children of a deceased unwed mother. Although the broad language of the opinion in *Stanley* may be subject to other interpretations, we believe the decision was meant to apply only within the narrow factual and legal context in which it was rendered.

In the present case, the death of the mother has not intervened. Upon the birth of the child, the right of the natural mother to custody was superior. *See Pierce* v. *Jeffries*, 103 W. Va. 410, 414, 137 S.E. 651, 652 (1927). Having custody under her superior right, the mother, by an agreement which is not in dispute here, relinquished the child for adoption. But this does not mean that the father's claim to custody should be treated as if the mother had died without having relinquished the child to others. Indeed, in light of the factual situation here presented, unless the child is legitimated by the marriage of her parents (Code § 64.1-6) before a petition for her adoption is filed, the consent of the father to the adoption will be unnecessary. Code § 63.1-225(2); *Szemler* v. *Clements*, 214 Va. 639, 642, 202 S.E.2d 880, 883 (1974).

*Stanley* is inapplicable for another reason. The putative father in *Stanley* had established a familial and custodial relationship with his children, and he had supported them. Thus, the severance of custodial rights without a due process hearing was the crucial basis of the *Stanley* decision. In the present case, the putative father has never seen his child, much less had custody of her. And his support of her has been non-existent.

Other reasons distinguished *Stanley* from the present case. Virginia has no law similar to the Illinois statutes under attack in *Stanley*. Furthermore, we know of no rule in Virginia which would raise a presumption of unfitness against an unwed father in any situation where he might seek to obtain or be called upon to defend the custody of his child. Where the natural mother, having custody, dies and the putative father seeks custody or

where, while living, she relinquishes custody to him and his right to retain the child is disputed, no presumption of his unfitness arises from the mere fact that he and the mother have not been married to each other. Nor, where she is declared unfit by a court of competent jurisdiction and he seeks custody, does any such presumption apply against him. And, of course, if the father legitimates the child by marrying the mother (Code § 64.1-6), he stands, with respect to the question of his parental fitness, as any legitimate father.

But whatever may be the application of *Stanley*, it is certain that the decision does not stand for the proposition that a putative father who is in fact unfit is nonetheless entitled to the custody of his child. Nor does the decision affect in any way the rule, extant in Virginia and elsewhere, that in custody disputes the welfare of the child is of paramount concern. *Forbes* v. *Haney*, 204 Va. 712, 716, 133 S.E.2d 533, 536 (1963). When the present case is tested against the fundamental principles, unchanged by *Stanley*, applicable in child custody disputes, reversal of the trial court's custody order is compelled.

As has been noted, although Hayes, the putative father, was awarded custody in this case, the trial court found that he had been "guilty of anti-social, immoral and illegal conduct." Clearly, this was a finding of unfitness. The finding was based, no doubt, upon the evidence that Hayes had not only sired Anita, the child involved in this case, in a meretricious relationship with the mother but had also become the father, five months after Anita's birth, of a second child as the result of an illicit relationship with yet another woman. The second child was, at the time of trial, in custody of its mother, supported by welfare and a $10 per week court-imposed contribution from Hayes.

While the expressed desire of Hayes to have custody of his child Anita may be "refreshing," as the trial court described it, we find it quite suspect in light of his conduct. Although openly admitting paternity of Anita, he has never offered any financial or other assistance to the child or her mother. He has never seen the child, expressed a desire to see her, or made any inquiry concerning her health and welfare. And his plans for the future care of Anita, if he should gain her custody, are so speculative and unsatisfactory that they deserve no comment.

Viewed against this picture of Hayes' utter unfitness as a parent, the question of what is best for Anita's welfare becomes

a simple matter. She has lived, almost since birth, with the proposed adoptive parents, whose fitness is unquestioned. She knows them as her only real mother and father. She is present in their home not only consonant with the wishes of her natural mother, expressed both in a written agreement and in sworn testimony in the trial court, but also as the result of the considered decision of the Department of Social Services. Anita has been provided security in her present surroundings in the proposed adoptive home. To remove her from that home and to place her in the unknown situation her putative father would provide is to experiment with her future welfare. The suggested experiment is too fraught with uncertainty to merit serious consideration. *Dyer* v. *Howell,* 212 Va. 453, 458, 184 S.E.2d 789, 793 (1971).

For the reasons assigned, the judgment of the trial court will be reversed and final judgment will be entered here awarding Anita's custody to the proposed adoptive parents.

*Reversed and final judgment.*