# CHARLESTON.

### FLETCHER v. HICKMAN.

Submitted June 17, 1901.   Decided November 23, 1901.

PARENT'S CONTRACT—*Infant's Custody.*

> When a father has committed the custody of his infant child to another person by agreement to be maintained and cared for, which agreement has been acted on by such other person, such agreement will bind the parent, and prevent his reclaiming custody of the child, unless he can show that a change of custody will plainly promote the child's welfare, moral or physical.   (p. 247).

Appeal from Circuit Court, Cabell County.

Application of Samuel G. Fletcher for a writ of *habeas corpus* against Sarah E. Hickman.   Judgment granting the writ, and defendant appeals.

*Reversed.*

M. K. DUTY and A. D. IRELAND, for appellant.

BRANNON, PRESIDENT:

This case involves no difficult principles of law; but it does involve one of the saddest and most trying duties of the many sad and trying duties which fall upon judges.   It is a contest between the father of two little children and the mother of their dead mother for their possession.   Samuel G. Fletcher and Virginia, his wife, nee Hickman, were married on the 30th of December, 1891.   They had three children, Curtis L., Lora and

Loring, the last two being twins. In July, 1899, the wife died. Shortly after her death these two children were committed to the custody of their grandmother, the mother of their mother, their mother being very much of an invalid from the birth of these twins. In fact at the very birth of these twins one of them Lora, was given to the grandmother by her parents. The grandmother took this child home with her and kept it some time. She took care of the child for several weeks after its birth, while the grandmother remained at her daughter's home taking care of the daughter, and shortly after the grandmother took the baby Lora to her home she was called back to her daughter to take care of her and her other child, both being very ill. She remained some time, then returned with Lora to her own home, leaving the other child with its mother at her request as she said it would be company for her until her mother would come back. Very shortly after this the father himself went to the home of the grandmother, Sarah E. Hickman, and took with him the other child, Loring, and gave it to her to be taken care of. Afterwards the mother and the children were taken to the home of Mrs. Hickman, where they stayed some time, when Mrs. Fletcher and one child returned to her own home, leaving the twins with the grandmother. In a few weeks Mrs. Hickman was called to the bedside of her daughter and remained with her until she died. This is Mrs. Hickman's version under oath: "I was there when the children were born and the mother was not able to take care of them. Their mother didn't know what to do with them and asked me if I would take one of them, and I said I would if they would give me the child as long as I should live, and they both agreed. I said I would rather have writings, and he said he would raise his hand to God that he would never take the baby from me as long as I lived. I stayed until the children were five weeks old, and I took my baby and went home, and in a few days they sent for me to come and take care of them as the other baby was sick. She said, 'Mother, I don't believe I will ever get well, and will not be able to raise my babies; will you take both these children and keep them?' I said I would if they would make it so I could hold the children. Sam said, 'If you will take them, if you will save that sick baby, and if Stat (his wife) never gets well, they shall be yours as long as you live, as God is my judge I will never take either of them babies in your

life.' And I said I would take them. He said if Stat got well I would have to give the little baby back. So I stayed all that winter, and then I brought his wife and children to my home, and stayed until Fall, and then I stayed there that Winter, and the next spring I brought his wife and family to my house, and they stayed until that fall, and then she got so poorly that I stayed all the time. There was never a soul slept with that Lora but myself, and this one to the best of my knowledge I was not away from her but six weeks. I had two bottles and raised them on the bottles. I set up seven long weeks to take care of this baby. I took care of the wife and children and all until she died. * * * * The day before she died she called me and Sam to the bed, and she said, 'Sam, will you promise me this: that you will never take my babies from my mother as long as she lives?' And he said he never would. She said, 'If I could know anything after I am dead, and knew any other person besides my mother had my babies, I could not rest in my grave.' She told us not to cry. She said, 'Sam, don't take my little babies from my mother,' and he said, 'I never will bother your mother as long as I live,' with tears rolling down his cheeks. How could he go back on the last words he spoke to his dying wife? She asked what time it was, and we told her. She said, 'I will soon be gone,' and that was the last words she spoke. She was in a sick chair, and when I seen the breath was gone, I could not look any longer. And that is the way I come by these children." Mrs. Hickman took the two children, Lora and Loring, to her home, while the boy, Curtis, remained with his father. Some months after the wife's death the father demanded the twins from Mrs. Hickman, and she refusing to surrender them, he sued out a *habeas corpus* from the circuit court of Ritchie County against Mrs. Hickman to compel her to surrender to him the twin children, and the circuit court rendered judgment compelling her to surrender them, and she has brought the case to this Court by writ of error.

As by the old law, as well as by the rule still prevailing, in a general sense the father is the natural guardian of a child, and liable for its support, and he was entitled to its custody, even against the other author of its being, the mother, as a general rule. As between the father and mother the courts have in later days considerably mollified that old rule, so that now the right

of the father, over that of the mother, is not unqualified, but subject to the peculiar circumstances of the particular case, which are not pertinent here. *State* v. *Smith,* 20 Am. Dec. 324 and note; 9 Am. & Eng. Ency. L. (2 Ed.) 867; *Cunningham* v. *Barnes,* 37 W. Va. 746. This is not a case between father and mother, and it is therefore more difficult to decide against the father. Still, as these children were only four years old when this *habeas corpus* was instituted, and as they had been raised from their birth by their grandmother, and knew no mother save her, her plea is almost as strong as that of the real mother. But there is a factor in this case which frees it from the perplexing hesitation which would afflict a judge were he deciding between the father and grandmother without that factor. That factor is that both the father and the mother, under the most solemn and pathetic circumstances, when the mother was looking into her grave and was anxious as to these little children, committed them to the grandmother upon the agreement and promise that she should keep them, and be entitled to retain them until her death. The mother knew they were tender babes. Her soul was sick in the hour of death about their custody when she should be no more. Her heart yearned with anxiety that her mother should take them and raise them, and she communicated this desire to her husband in her dying moments, and he solemnly agreed to it in the presence of the grandmother, and the grandmother accepted this pious but burdensome trust, and it thus became a contract in the most solemn form and under the most impressive circumstances, if such a contract there can be in law to bind the father. The grandmother swears to this in the most solemn form. Other witnesses confirm it. It is fairly well proved. Indeed, the very fact that these children had been raised by the grandmother to their then age of under four years, and the father had no one to look to for their care, and they must have such care, we are justly warranted in saying that such a contract was in all human probability made. The only question then remaining is what is the effect upon the father of such a contract. JUDGE ENGLISH in *Cunningham* v. *Barnes,* 37 W. Va. 746, cited authorities to sustain the binding effect of such a contract upon the father, and this Court held it binding in that case. The same principle is held to apply to such a contract between a father and grandparents in *Green* v.

*Campbell,* 35 W. Va. 698. This settles the case against the plaintiff in this writ of *habeas corpus.* Unless the welfare of the child demands a disregard of such a contract, it is binding. It is not binding under those decisions if the welfare of the child does demand that the contract be disregarded. But the welfare of these children does not demand, but denies, that these children should be taken from their grandmother. They have never known any other mother. Mrs. Hickman's family is composed of herself, her husband and one son, and they are capable of taking care of them and are very much attached to them. The children must be attached to their grandparents. Would the children be happy if taken from their present home and from the loving care of their grandmother? Would they not be miserable? It is proven that they have a good home and are tenderly cared for. When so young should they be torn from their present home. Their grandmother shows in the strongest manner her love for them. She said in her evidence, "I love to keep them, and I would rather Sam Fletcher would shoot my heart out than take them. They are all the company I have." If taken from her, to what home would they be taken? The father is a conductor on through freight trains on the Baltimore and Ohio Railroad, and can seldom be at home. If he takes them to his own mother, who never even knew them scarcely, however worthy she may be and doubtless is, they would not be as happy as with Mrs. Hickman. In fact, it does not appear that their paternal grandmother desires their custody, but on the contrary, we may infer that she does not desire them to be placed in her custody. The plaintiff was asked if he did not go to his mother and ask her to take Loring, and whether she didn't reply, "Sam, I raised my children and you can raise yours." He declined to answer the question. Thus we are not only justified in this decision by the force of the husband's said agreement, but also by considerations for the welfare of the children themselves. Therefore, we reverse the judgment and remand Lora Fletcher and Loring Fletcher to the custody of Sarah E. Hickman, their grandmother, and dismiss the writ of *habeas corpus.*

*Reversed.*