# CHARLESTON.

FLORIAN ODLASEK *et al.* v. MARY ODLASEK.

(No. 5133.)

Submitted February 24, 1925.   Decided March 3, 1925.

PARENT AND CHILD—*Parent Parting With Custody of Child by Fair Agreement will not be Allowed to Reclaim, Unless He Can Show Benefit to Child.*

> Point 6 of the syllabus of *Green* v. *Campbell*, 35 W. Va. 698, the syllabus in the case of *Fletcher* v. *Hickman*, 50 W. Va. 244, and points 1 and 2 of the syllabus in the case of *State* v. *Bonar*, 75 W. Va. 332, followed and applied.
>
> (Parent and Child, 29 Cyc. p. 1601.)
>
> (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Marshall County.

Habeas corpus proceeding by Florian Odlasek and another for custody of their daughter, Josephine Odlasek, resisted by Mary Odlasek. A ruling adverse to her being made by the trial court, Mary Odlasek brings error.

*Judgment reversed; writ dismissed.*

*J. Howard Holt,* for plaintiff in error.

*James D. Parriott* and *Martin Brown,* for defendants in error.

HATCHER, JUDGE:

This is a habeas corpus proceeding brought in the circuit court of Marshall county by Florian Odlasek and Uli, his wife, for the custody of their daughter, Josephine. Mary Odlasek, the grandmother of the child, resisted the application. The grandmother complains here of an adverse ruling of the lower court.

Josephine, who is now fourteen years of age, has been in the custody of her grandmother nearly all her life. She was placed in the arms of her grandmother at a tender age, and on May 28, 1915, this custody was confirmed by her father in a written contract between Florian Odlasek, on the one part, and Mary Odlasek and Joseph, her husband, on the other part, which is as follows:

"This Agreement, Made and entered into this the 28 day of May, A. D. 1915, by and between Florian Odlasek, party of the first part, and Joseph Odlasek and Mary Odlasek, his wife, parties of the second part.

"Whereas, the said party of the first part is the father of a daughter, Josephine Odlasek by name, and;

"Whereas, the said Josephine Odlasek is now and has for some time past been in the care and custody of the said parties of the second part, and;

"Whereas, it is the desire of the said parties of the second part to retain possession of the said child, and care for and educate her;

"Now, Therefore, This Agreement Witnesseth, That the said party of the first part agrees that the said parties of the second part shall retain possession of said child so long as they shall live, on condition that they will care for her and educate her; and upon the further condition that the said party of the first part shall have full right and privilege of visiting and seeing the said child at any time he may so wish. If at any time the said parties of the second part desire to surrender the said child, the said party of the first part agrees to accept her back into his home.

"Witness the following signatures and seals, this day and year first above written.

"Signed)          FLORIAN ODLASEK     (Seal)
                  JOSEPH ODLASEK      (Seal)
                  MARY ODLASEK        (Seal)"

Florian moved to Ohio about the time of the agreement, leaving Josephine with the grandmother. He has lived in Ohio the last nine years. He works for a coal company, and resides in a company house. Joseph, who was the step-father of Florian, and no blood relation of Josephine, deserted Mary several years ago. After this desertion, to-wit: on November 19, 1923, by a written notice, he signified to Florian his desire to renounce the contract of May 28, 1915, and to surrender to Florian the child, Josephine.

The evidence shows that while Mary Odlasek is perhaps a rough and uncouth woman, she has worked hard and cared for Josephine, as well as could be expected of a woman in her

position in life. The evidence also shows that Florian, while certainly no better, is perhaps no worse than the average immigrant of his class; that he is a drinking man, but a good wage-earner, and has taken the care of his family usually taken by a foreigner in his station in life.

Both the grandmother and Josephine testified to having seen improper familiarities between Joseph and Uli. Joseph did not go on the witness stand. Uli denied the improper conduct. The English translations of two very obscene letters, purporting to have been written to Uli in the Slovakian language by Mary, were introduced in evidence, upon the mere affidavit of the interpreter, who was not called as a witness. We think the introduction of these translations was improper. It is true that one Frances Prah, a witness for the petitioners, stated that the language in the original letters and the language in the translations were the same, but this answer was given in response to a question which asked her to state "so far as you have read it and compared it." She was not entitled to testify that the translations were correct unless she had made a complete and thorough examination of the originals and the translations. The evidence did not show she had made such comparison.

Florian contends that Joseph's revocation of the written contract destroyed not only Joseph's right, but also Mary's right to Josephine, and that his daughter should now be returned to him, because: (a) his mother uses such foul language that she is not a fit person to have the custody of Josephine, and (b) since Joseph's departure from the household, Mary will not be able to properly support and maintain Josephine.

The grandmother testified that she owned her own property; that she was getting $20.00 a month rent for certain of her rooms; that she earns by her labor at the washtub, an average of $5.00 a week; that she has been supporting herself and Josephine since the defection of Joseph; that she is fully able and competent to care for and support Josephine as well in the future as she has done in the past, and to give her such education as the free school and high school in the vicinity offer. In support of her claims, quite an array of witnesses gave testimony; all of whom give her a good name

and say that she has taken as good, if not better care of Josephine as is taken of the average child in the neighborhood. Among these witnesses who testified in behalf of Mary is a deputy sheriff, a prominent physician of the neighborhood, and the Prosecuting Attorney of the county. The Prosecuting Attorney, the Honorable Lloyd Arnold, stated that he had conducted certain business matters for Mary; that he had made an investigation of her reputation and standing in the community in which she lived; that her reputation was good and from his own knowledge of the woman, he believed her to be a woman of high character, considering her nationality and class of people. He furthermore thought that she was perfectly able and competent to raise Josephine properly, and that her home was a comfortable home and furnished in such a way as to make it suitable for her and Josephine.

The physician, Dr. Charles Morton, has been acquainted with Mary for about twelve years, during which time he has been to her home frequently on professional visits. He stated that he had never seen anything improper at Mary's home; that Josephine was always well clothed and well nourished, and he thought that Mary was perfectly competent to raise Josephine. In response to a question asked by the attorney for Florian, as to what he thought about Florian's rights to Josephine, the doctor said: "I think the father should have taken care of her for the last ten years instead of the grandmother washing over the washtub."

Upon the witness stand, Josephine displayed more than ordinary intelligence for a child of her age. In positive terms, she stated a dislike for her parents and her preference for her grandmother.

By virtue of the contract of May 28, 1915, Josephine was consigned to the custody of Mary, the grandmother, as well as that of her husband, Joseph, and not the custody of Joseph alone. Mary was the responsible one of this contract. She is the one who owned the property in which Josephine was reared. She was the blood relation of Josephine. She is the one who assumed the active care and responsibility of Josephine. She is the one who loved Josephine. When the breach came between Mary and Joseph, Joseph, not Mary,

was the one who departed. The abrogation of· his rights under the ˙contract ˌof 1915 will therefore not be permitted to effect the rights of Mary thereunder.

We find the general law in such cases as this well settled in West Virginia, by the several decisions in *Green* v. *Campbell*, 35 W. Va. 698; *Fletcher* v. *Hickman,* 50 W. Va. 244, and *State* v. *Bonar,* 75 W. Va. 332. From the first case cited, we quote the following:

> "When a parent has transferred to another· the custody of his infant child by fair agreement which has been acted on by such other person, to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of ˌthe child, unless he can show that a change of custody will materially promote his child's welfare, moral or physical."

Here we have the custody of the child committed ˌby the father by a *fair agreement* to the grandmother. He moved to another state, leaving the child with the grandmother, who *acted* on the agreement, by maintaining and supporting the child. Say that Mary is given to the use of rude and coarse language. We must then also˙ assume that her habit in this respect is no worse now than it was years ago when Florian willingly consigned Josephine to her care. It is common information that the ·class of foreigners to which Mary belongs thinks nothing of the use of certain coarse words in ordinary conversation, which are never used in conversations which "stamp the cast of Vere de Vere." If *like mother, like son,* then it is a fair assumption that Florian and Florian's wife use the same coarse language that the grandmother uses, and consequently, Josephine would be no better off with her parents than with her grandmother. Florian and Uli permitted Josephine to remain with the grandmother for three years after the date of the letters, which they now protest, before this suit was entered. Their late solicitude for Josephine in this respect is not timely.

The drinking and bootlegging charge against Florian ·and Uli by Josephine, as well as Mary, are not chargeable to Mary. Mary's home is respectable and Josephine has been given a

fair secular, as well as religious education. We fail to see how a change to Florian's home would promote the moral welfare of the girl. If the care that Mary has taken of Josephine in the past is a fair indication of what she can do in the future, we do not see that Josephine would fare physically any better with her parents than with her grandmother. For the present, Mary seems fully able to care for Josephine's material needs.

Mary and Josephine love each other even as mother and daughter love. Each desires and each needs the other. Their association together cannot now be subject to the whim and caprice of Florian and Uli. Josephine, at the age of 14, is standing "where the brook and river meet." The best interests of this adolescent girl demand that she remain with the grandmother, whom she both loves and respects, rather than go to her mother, for whom she professed neither sentiment.

The old grandmother at her washtub has thereby paid a dear price for the custody of Josephine. This court honors her toil. We regard it, in connection with her tender care of the girl, a consideration so valuable in this case as to cancel the rights of parenthood. The grandmother has again achieved motherhood. Josephine is grandma's girl.

Finding nothing in the evidence to indicate that a change of custody will promote the welfare of the child, the judgment of the lower court is therefore reversed, Josephine Odlasek is remanded to the custody of her grandmother, Mary Odlasek, and the writ of *habeas corpus* herein dismissed.

*Judgment reversed; writ dismissed.*