TOLER, administrator, *v.* GOODIN.

528

No. 15301.   MARCH 4, 1946.   ADHERED TO ON REHEARING.   MARCH 25, 1946.
SECOND REHEARING DENIED MARCH 29, 1946.

*D. R. Pearce* and *Jule Felton,* for plaintiff in error.

*Jared J. Bull* and *B. F. Neal,* contra.

BELL, Chief Justice. (After stating the foregoing facts.) The only contention · urged in this court under the general demurrer is that there was no allegation in the petition that the Tolers did not adopt the plaintiff, as they allegedly agreed to do. As to this contention, so far as we are aware, there is no decision by this court directly in point, other than certain physical precedents. *Crawford* v. *Wilson,* 139 *Ga.* 654 (78 S. E. 30, 44 L. R. A. (N. S.) 773); *Columbus Bank & Trust Co.* v. *Jones,* 176 *Ga.* 620 (168 S. E. 561); *Fussell* v. *Daniels,* 179 *Ga.* 462 (176 S. E. 369).

Since the plaintiff by her petition is seeking · equitable relief only, it would seem that such an allegation would be necessary in order to show that she is entitled to such relief. *Steed* v. *Savage*, 115 *Ga.* 97 (2) (41 S. E. 272); *Whitson* v. *Atlanta*, 177 *Ga.* 666 (170 S. E. 888); *Pair* v. *Pair*, 147 *Ga.* 754, 758 (95 S. E. 295). However, it is a well-settled rule of construction that what is clearly implied is as much a part of a pleading as what is expressed; and considering the instant petition as a whole, we think that the requisite allegation was necessarily implied. 41 Am. Jur. 293, § 10; 49 C. J. 120, § 114. See also *Davis* v. *Arthur*, 139 *Ga.* 74 (4) (76 S. E. 676).

This was not a suit to require any one to adopt the plaintiff, but it was a suit to establish title to property by decreeing the plaintiff entitled thereto as a child of the alleged obligors, just as though she had been legally adopted according to the alleged agreement. "A parol obligation by a person to adopt the child of another as his own, accompanied by a virtual though not a statutory adoption, and acted upon by all parties concerned for many years and during the obligor's life, may be enforced in equity upon the death of the obligor, by decreeing the child entitled as a child to the property of the obligor, undisposed of by will." *Crawford* v. *Wilson*, 139 *Ga.* 654 (supra). In such a case, "equity considers that done which ought to have been done, and as one of the consequences, if the act of adoption had been formally consummated, would be that the child would inherit as an heir of the adopter, equity will enforce the contract by decreeing that the child is entitled to the fruits of a legal adoption." Ibid, p. 659; Code, § 37-106. The petition here was in harmony with this principle, and by its allegations and prayers clearly showed an intention to invoke it. The petition was thus, in effect, nothing less than a representation to the court that the plaintiff was entitled to a decree treating as done that which ought to have been done, and this necessarily implied that the Tolers had not adopted her, in accordance with the alleged agreement. Its whole tenor and import are utterly inconsistent with any supposition that she was ever so adopted, and therefore it shows by clear and necessary implication that no such formal adoption was ever consummated. It is true that a petition, when considered on general demurrer, must be construed most strongly against the pleader, and that in

applying this rule the petition should be construed in the light of its omissions as well as its averments. *Toney* v. *Ledford,* 184 *Ga.* 856 (2) (193 S. E. 761); *Mackler* v. *Lahman,* 196 *Ga.* 535 (27 S. E. 2d, 35). But this does not mean that the petition must be given a strained construction, in violation of its reasonable and necessary intendment. *Krueger* v. *MacDougald,* 148 *Ga.* 429 (96 S. E. 867); *Georgia Power Co.* v. *Leonard,* 187 *Ga.* 608, 614 (4) (1 S. E. 2d, 579). While some of the allegations here might perhaps have been subject to a special demurrer calling for more specific information with respect to the matter under consideration, we do not think that the petition, when construed reasonably according to its natural import, was subject to general demurrer for the reason urged.

■ The plaintiff in error insists only on the 6th ground of his special demurrer, to wit: "He demurs specially to paragraph eleven of the petition because in said paragraph certain allegations appear, viz., 'The Tolers further at said time and place proposed to petitioner's father that, if he would relinquish all claims of all nature to petitioner, that they, Mr. and Mrs. C. J. Toler, would adopt petitioner as their own child;' and the following words, 'D. J. Bryan then and there accepted said proposition and turned over your petitioner unreservedly to Mr. and Mrs. C. J. Toler;'" the objections being that "said expressions are conclusions of the pleader, and it is legally requisite that the identical words and the circumstances of their use should be set forth accurately in the petition." The allegations were not subject to the objections made. They set forth plain, definite, and traversable facts, and the plaintiff can not be required to set forth the evidence, or the exact conversation by which he expects to prove the allegations made. *Bittick* v. *Ga. Fla. &c. Ry. Co.,* 136 *Ga.* 138 (70 S. E. 1106); *Lefkoff* v. *Sicro,* 189 *Ga.* 554 (10) (6 S. E. 2d, 687, 133 A. L. R. 738); *Cedartown Cotton & Export Co.* v. *Miles,* 2 *Ga. App.* 79 (58 S. E. 289); *Wrightsville & Tennille R. Co.* v. *Vaughan,* 9 *Ga. App.* 371 (2) (71 S. E. 691); *Watts* v. *Rich,* 49 *Ga. App.* 334 (2) (175 S. E. 417).

■ Before the trial term, the defendant filed a written application praying that D. J. Bryan, the father of the child, be made a party plaintiff. The court denied the rule nisi, exceptions pendente lite were taken, and error is now assigned thereon. It

was urged that the father was a necessary party plaintiff for the reason that he was a party to the alleged contract. In *Crawford* v. *Wilson,* 139 *Ga.* 654 (2) (supra), it was held that, "Such an equitable suit is maintainable by the child in her own name against the administrators of the obligor." In *Copelan* v. *Montfort,* 153 *Ga.* 558 (113 S. E. 514), a case involving the same question, it is stated on p. 567 that "the father was not a necessary party to the petition." See also *Lansdell* v. *Lansdell,* 144 *Ga.* 571 (1, 2) (87 S. E. 792).

■  We consider next the general grounds of the motion for a . new trial. As to this phase of the case, the principal question is whether the evidence was sufficient to prove the alleged contract between the plaintiff's father, D. J. Bryan, and Mr. and Mrs. C. J. Toler, whereby the Tolers agreed to adopt the plaintiff as their child. Accordingly, in addition to the evidence set forth in the statement, it is necessary to consider the testimony relating to the conversation between Mrs. Toler and the father, Bryan, and also the conversation between both Mr. and Mrs. Toler and Bryan. Mr. Bryan testified: "Mrs. Ethel Goodin  .  .  is my daughter. She was born September 9, 1909. Her mother died the next morning after she was born. I had seven other children at the time. The oldest about 12 years. .  . My wife was Mrs. C. J. Toler's sister. .  . Had no one to properly care for my infant baby except Mrs. Toler. They did not have any children. .  . She told me that she wanted to. ask about taking the child, said I was not in shape  .  . with seven other children and financial conditions not good. .  . I told her she could have the child. .  . We carried the baby then down to Mrs. Toler's mother. Mrs. Toler cared for the baby. .  . The physical condition of the child was not good. .  . My other children were staying there until I could get settled  .  . until I married again, .  . I remarried  .  . some time in March. .  . After I married I took the larger children back, all except the baby. She stayed with Mrs. Toler. I had a conversation with C. J. Toler—he talked some with me in Lumber City about it about 1910. .  . The way he spoke they would be glad to have her and they would treat her just as good as they could. .  . I had one conversation with him at McRae  .  . similar to  .  : that  .  . in Lumber City. I had a conversation with Mr. and Mrs. Toler when

they were together after I married. . . . They came over to see me about the child, . . and wanted to know if after I married I . . had decided to change my mind possibly and take her back. . . I told them the trade was the same. . . The trade was they were to take the child as their own child. I retained no claim whatever. She never lived in my home. I never saw her from her birth until twelve years of age. . . I contributed nothing whatever to her support."

Upon cross-examination, the witness's attention was called to previous interrogatories in which he had testified: "Her and Toler were separated and they had no children, seemed is [if?] they had one of their own, that was the talk they had with me—that they wanted the child—that was all I know except they wanted me to give her to them. At first I hated to part from her but afterwards I gave her the child. I told them that I would not ever interfere if they treated her all right. I did not interfere. At the time the transaction was entered into I have told you all I know and I have not interfered. The conversation with Mrs. Toler and Mr. Toler referred to occurred in Telfair County, not at the funeral of my wife. That conversation at the funeral of my wife was with Mrs. Toler." He then stated, "I don't know anything I want to add to the statement."

The witness was then asked the following question: "The case on which your daughter relies states that on September 10, at and after the funeral of petitioner's mother, Mr. and Mrs. C. J. Toler requested the father of your petitioner to give her to them, stating at that time in the presence of each other that he would not be able to properly provide for and rear your petitioner, while they, Mrs. Toler and C. J. Toler, were amply able financially to properly provide for and educate your petitioner. The Tolers further said at that time and place and proposed to your petitioner's father that, if he would relinquish all claims of any nature to petitioner, that they would (Mr. and Mrs. C. J. Toler) adopt petitioner as their own, would love and provide for her fully all things essential to her welfare and make her the heir to inherit at their death as if she had been their natural child. D. J. Bryan then and there accepted said proposition and turned over your petitioner unreservedly to Mr. and Mrs. C. J. Toler." To which he replied, "Well, I did." Continuing, the witness stated:

"As to whether the agreement happened in accordance with that allegation—it happened there first pretty much like that petition, and the same thing occurred again after I married. . . Toler was not at my wife's funeral. . . At that time they were living separate. . . My second wife . . is dead. I relied on the last contract. . . That was the last talk we had. . . I can not tell you right definite the length of time it was from the first to the last conversation with C. J. Toler. . . I remember the conversation very well. . . The Tolers were in fairly good shape. . . When I did see her [the child], I never related to her anything about any scheme I had up for her living and betterment and location. . . I don't know whether she was ever told or not. . . I was never with her to tell her anything. I had never told her before I saw her at 14 years of age or since."

Upon a redirect examination, after a motion for nonsuit, the witness further testified: "Referring to consideration and agreement between me and Mr. and Mrs. Toler, . . they wanted . . to know if I would make any interference complaint against them about the child, anything like that; I told them, 'No.' . . The subject of the words . . were about like this: . . That she would be their child, in their home, fare as they fared, and would be an heir to anything that they possessed during their life, or something along like that, or at their death she would inherit whatever they possessed at their death as one of their children. That is about the pith of all I remember about that. In response to that, I gave the child to them, and told them that I would never interfere."

The general principle on which a court of equity may in a proper case allow a recovery under the so-called doctrine of virtual adoption has been quoted in the first division, supra. On the general subject, see *Richardson* v. *Cade, 150 Ga.* 535 (104 S. E. 207); *Copelan* v. *Monfort* (supra); *Ansley* v. *Ansley, 154 Ga.* 357 (114 S. E. 182); *Chamblee* v. *Wayman, 167 Ga.* 821 (3) (146 S. E. 851); *Columbus Bank & Trust Co.* v. *Jones, 176 Ga.* 620 (supra); *Fussell* v. *Daniels, 179 Ga.* 462 (176 S. E. 369); *Rieves* v. *Smith, 184 Ga.* 657 (192 S. E. 372, 112 A. L. R. 368); *Butler* v. *Ross, 188 Ga.* 329 (4 S. E. 2d, 21); *Savannah Bank & Trust Co.* v. *Wolff, 191 Ga.* 111 (11 S. E. 2d, 766); *Pierce* v. *Harrison, 199 Ga.* 197 (33 S. E. 2d, 680).

There is no contention on the part of the plaintiff in error as to the soundness of the rule, but he takes the position that the instant case does not meet its requirements, in that the evidence does not establish a contract to *adopt* the child. More particularly he insists that nowhere in the evidence is the word "adopt" used in any agreement on the part of the alleged foster parents; and that there could be no valid contract without the express use of the term "adopt." Whether or not the foregoing statement of the witness Bryan, "Well, I did," considered with the context, could have been taken by the jury as showing a specific offer by the Tolers to "adopt," and an acceptance of such offer by the parent, we do not think that the specific word "adopt" must in every case be used in a contract of this nature. It is true that, in order to be enforceable under the doctrine of virtual adoption, the contract must comprehend and intend a legal adoption according to statute. *Jones* v. *O'Neal,* 194 *Ga.* 49 (20 S. E. 2d, 585). This, however, is not to say that language clearly having that meaning under the attendant and surrounding circumstances, though not containing precise legal phraseology, would be insufficient. In this connection, attention is also specifically called to the following additional testimony of the witness Bryan, as stated above: "As to whether the agreement happened in accordance with that allegation—it happened there first pretty much like that petition, and the same thing occurred after I married. . . The subject of the words . . were about like this: . . That she would be their child, in their home, fare as they fared, and would be an heir to anything that they possessed during their life, or something like that, or at their death she would inherit whatever they possessed at their death as one of their children. That is about the pith of all I remember about that. In response to that, I gave the child to them, and told them I would never interfere." While this language did not contain the technical word "adopt," it did contain a clear definition of the legal status created by a statutory adoption. Code, § 74-404. And if the Tolers did agree to establish the status and relationship as indicated by such testimony, the agreement would include an obligation to do all things reasonably necessary to effectuate such result. Martin *v.* Martin, 250 Mo. 539 (157 S. W. 575). "The difference between a necessary allegation in a declaration and the evidence which may be sufficient to sustain such allega-

540

tion is clear." *Kendall* v. *Wells,* 126 *Ga.* 343, 352 (55 S. E. 41). Witnesses are not expected to be as definite and precise as a pleader must be, and there is authority to the effect that an oral agreement to adopt may be shown by the acts, conduct, and admissions of the parties, and that in order to establish such a contract, the exact word "adopt" need not be used. See in this connection, 2 C. J. S. 396, § 26; Remmers v. Remmers (Mo.) 239 S. W. 509; Taylor v. Coberly, 327 Mo. 940 (38 S. W. 2d, 1055) ; Lynn v. Hockaday, 162 Mo. 111 (61 S. W. 885, 85 Am. St. R. 480) ; Parks v. Burney, 103 Neb. 572 (173 N. W. 478) ; Lamb v. Feehan (Mo.) 276 S. W. 71.

In the instant case, the proof did not depend entirely upon the testimony of the witness Bryan. There was, as we have indicated, much additional evidence, relating to statements of the Tolers, the conduct and apparent relations as between them and the child, and other circumstances corroborating his testimony, and pointing toward the conclusion that there was an agreement to adopt. Considering the evidence as a whole, we think that the jury were authorized to find that there was such a contract. Nor, in so holding, do we overlook the rule that in such a case the alleged agreement must be proved so clearly, strongly, and satisfactorily as to leave no reasonable doubt in the minds of the jury. *Ansley* v. *Ansley,* 154 *Ga.* 357 (5) (supra) ; *Salmon* v. *McCrary,* 197 *Ga.* 281 (29 S. E. 2d, 58).

■ The 1st ground of the amended motion is divided into six subheads, all being mere elaborations of the general grounds. They make the following contentions, in addition to those above dealt with: The evidence failed to show that the child was not legally adopted by the Tolers, and also failed to show the performance of a contract by the child; it showed that there was no contract or intention of the father to relinquish control or dominion over her, for the reason that he reserved the right to interfere if the child was not "treated right;" and it further showed that, if there was a contract to adopt, it was made with Mrs. Toler alone, and if such a contract was made with Mrs. Toler alone, and the custody of the child was unconditionally surrendered to her, the evidence did not authorize a recovery on the alleged contract sued on, to wit, a contract with Mr. and Mrs. Toler.

There is no merit in these contentions. The alleged agreement

did not stipulate anything as to performance by the child, and so there was no defect in proof as to this point. *Chamblee* v. *Wayman,* 167 *Ga.* 821 (3) (supra). This statement is not contrary to the ruling in *Rahn* v. *Hamilton,* 144 *Ga.* 644 (2) (87 S. E. 1061), referring to "equitable status." The evidence showed relinquishment by the father. Nor was there a fatal variance as between the allegations and proof with respect to the alleged agreement. *Napier* v. *Strong,* 19 *Ga. App.* 401 (91 S. E. 579). Moreover, under the agreement made at the trial, the only issue to be submitted to the jury was whether or not the Tolers contracted with D. J. Bryan to adopt the child; accordingly, the question as to whether the child performed a contract was not in issue. Nor under this agreement, was it necessary to prove that there had been no statutory adoption. While the defendant did not waive his demurrer, he apparently rested thereon, without requiring proof as to this matter. *Albany Phosphate Co.* v. *Hugger Bros.,* 4 *Ga. App.* 771 (1*a*) (62 S. E. 533). The evidence did not demand a finding that the plaintiff was barred by laches, even if such a finding might have been authorized.

■ In the 2nd ground of the amended motion, it is alleged that the court erred in charging as follows: "So the question for you to determine in this case is—did the Tolers contract with the father of plaintiff to adopt the plaintiff as their child as alleged, and was the contract complied with on the part of the father? If you find that the Tolers contracted with the father of the child to adopt her as alleged in the petition and the contract was performed by the father, then you should find for the plaintiff." The movant contends that this charge was error because the evidence did not authorize it, and he further set forth the identical reasons that were assigned under the 1st ground of the amended motion. The evidence authorized the charge, and there was no merit in any of the exceptions taken thereto.

The same ruling will apply to the 3rd ground of the amended motion, complaining of an omission to charge.

■ The 4th ground of the amended motion was the refusal of the court to admit in evidence a letter written by Justice Warren Grice to the attorney for the defendant in the court below, and as to which there had been an agreement between counsel "that the foregoing letter shall be used as a deposition under the

rules of law as to admissibility." The letter related certain matters that would prevent the writer from attending the trial as a witness, and then stated that for a period of five or six years (computed as being from about 1931 to 1937), he was intimate with the Tolers, that he spent the week-end with them about once a month, and he visited with them in other homes, and they visited his home. A portion of the letter told of the great affection the Tolers manifested for a nephew, Bill Powell, who on all of the writer's visits was present in their home. The letter stated also that on one occasion there was a niece of Mrs. Toler whom the writer saw there, but that according to his recollection, she left after supper to spend the night elsewhere. The writer did not say whether this niece was the present plaintiff, or some other niece of Mrs. Toler. After stating that the writer could not recall whether he had ever heard either of the Tolers say they had adopted Bill Powell, or that he would get their property, the letter concluded as follows: "I know I have never heard either Mr. or Mrs. Toler say anything about having adopted any one else, nor have I heard either of them speak in terms of affection of any niece of either of them. My recollection of many visits to the Tolers and of the many conversations we had is, that I was left with a distinct impression that the future of this couple was very much wrapped up in Bill Powell, and he was a [as] near a son to them as one could be. I did not from these conversations get the impression that either of them had the same kind of affection for any other niece or nephew of Mr. and Mrs. Toler. I am sure that I never heard either Mr. or Mrs. Toler say that he or she had adopted any niece, or that either of them expected any niece to get the property of either of them; and never while I was there did I witness any niece looking after them or staying with them, or contributing anything to their support or comfort."

It is insisted that this letter was admissible for the purpose of illustrating whether there was a contract for adoption. The period covered by the evidence was from 20 to 25 years after the contract was alleged to have been made, and was several years after the child had grown to womanhood, and had married and moved away. It was a statement to the effect that the writer of the letter had never heard either Mr. or Mrs. Toler say they had adopted a niece or that either expected any niece to inherit their property.

This evidence was merely negative in character, and was too remote to have any evidentiary value on the issue as to whether a contract to adopt was made, as claimed by the plaintiff. *DeNieff* v. *Howell*, 138 *Ga.* 248 (2) (75 S. E. 202).

■ In the 5th ground of the amended motion, error is assigned on a ruling of the court excluding testimony that Mr. and Mrs. Toler had stated that two other children (not including the child here involved) were their adopted children. Counsel stated to the court that the purpose of this evidence was to show "what Mr. and Mrs. Toler meant by the word 'adopted.'" We cannot see how this type of evidence, especially a bare and unexplained statement such as that mentioned by the witness, could illustrate the issue as to whether the parties ever entered into a contract to adopt the child here in question. There is no merit in this ground.

■ The 6th ground alleged that the court erred in admitting in evidence an authenticated copy of an application of C. J. Toler for a homestead in Florida which contained the following question and answer: Q. "If married, of whom does your family consist? A. My wife and adopted daughter and myself." Inasmuch as the evidence discloses that at the time this application was made the child in question was living with the Tolers, it was relevant as illustrating whether there had been a contract to adopt the child.

10. The 7th ground alleged that the court erred in admitting in evidence, over the objection that it was a conclusion of the witness, Mrs. W. A. Spillers, the statement, "Mr. and Mrs. Toler and their daughter Ethel constitute their family;" contending no facts were stated upon which such a conclusion could be based. Reviewing the testimony of this witness, we find that she further testified that she met the Tolers in Cocoa, Florida, when they brought their daughter Ethel to her to take music, and that she taught the daughter for three years. At this time Ethel was about eight years old, and called them "Mama" and "Daddy." The witness did not know for a long time that the child was not their own child, and she knew the child only as Ethel Toler. When the Tolers moved to Georgia, Ethel stayed with the witness for about three months, until they returned and carried her to Miona Springs. In view of the entire testimony of this witness, the objection was without merit.

■ The 8th ground of the amended motion contends that the

court erred in admitting the following testimony of the witness H. H. Sams: "She (Mrs. Toler) told me that . . she had adopted the child (Ethel Toler, plaintiff) since she was a baby." As already ruled in the 6th division of this opinion, this evidence was relevant as illustrating whether there had been a contract to adopt the child.

The evidence authorized the verdict for the plaintiff. The court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Duckworth, J., who dissents, and Head, J., who dissents in part.*

### ON REHEARING.

After affirmance of the judgment in this case, a motion for rehearing was granted, and the opinion has now been revised and supplemented, but since we still find no error, the judgment must be adhered to.

*Judgment adhered to on rehearing. All the Justices concur, except Duckworth, J., who dissents, and Head, J., who dissents in part.*

### ON SECOND MOTION FOR REHEARING.

1. As to the general demurrer: The petition having alleged an oral contract between the plaintiff's father and the Tolers (both now deceased), wherein the Tolers agreed to adopt her, together with additional facts showing that she is entitled to the benefits of such contract, and having further alleged that the administrator has entirely ignored her as being an heir or having any interest in the estate of C. J. Toler, and having prayed that the administrator be required to fulfill the obligations and contracts of C. J. Toler by turning over and paying to the plaintiff the entire net proceeds of the C. J. Toler estate, these facts and circumstances as shown by the petition *necessarily implied* that the plaintiff had never been legally adopted by the Tolers, in compliance with such alleged contract. The first ground of the motion for rehearing is without merit.

2. The contentions urged in the other grounds of the motion have been sufficiently dealt with in the opinion, and show no cause for a different judgment.

*Motion for rehearing denied. All the Justices concur, except Duckworth, J., who dissents, and Head, J., who dissents in part.*

DUCKWORTH, Justice, dissenting. 1. It must be conceded that

it is essential to the right of the petitioner to maintain an action for virtual adoption that there must have been a breach of the contract to adopt. This is true for the reason that, had the contract to adopt been performed, the petitioner would inherit as a child, and in that event would have no right to make an equitable claim against the estate. If, therefore, the maintenance of the present suit is dependent upon a breach of the alleged contract to adopt, then such a breach is an essential part of the petitioner's case. If essential, it must be proved, and if there is a necessity to prove such a fact, then likewise it is necessary to allege it. This proposition is well stated in *Groover* v. *Simmons,* 163 *Ga.* 778, 780 (137 S. E. 237), as follows: "A fundamental rule of evidence is that a party is not permitted to prove matters which are not put in issue by his pleadings. *Pirkle* v. *Cooper,* 113 *Ga.* 828 (4) (39 S. E. 289) ; *Insurance Co.* v. *Leader,* 121 *Ga.* 260 (48 S. E. 972). It is an equally fundamental canon of pleading, especially as related to a plaintiff, that he must plead as well as prove every material essential necessary to enable him to carry the burden of establishing the affirmative of the issue." I take it, therefore, that there is and can be no question but that as a matter of law the maintenance of the present action is dependent upon the allegation and proof that the Tolers breached the alleged contract to adopt. An examination of the petition not only utterly fails to disclose an allegation of this essential, but in fact contains averments that as a matter of law show the non-existence of this essential fact. The petition sets forth the alleged agreement and the alleged performance upon the part of the petitioner, and then alleges that by reason of these facts the petitioner is an heir and entitled to inherit as such from the Tolers. Such an allegation is the equivalent of alleging an actual legal adoption, for it would be by such procedure only that the petitioner's allegation can be true. To uphold the petition as against the challenge of the general demurrer, would in my opinion squarely violate the universally accepted applicable rule which is well stated in *Krueger* v. *MacDougald,* 148 *Ga.* 429 (96 S. E. 867), as follows: "It is an elementary rule of construction, as applied to a pleading, that it is to be construed most strongly against the pleader; and that, if an inference unfavorable to the right of a party claiming a right under such a pleading may be fairly drawn from the facts stated therein, such

inference will prevail in determining the rights of the parties." It should be noted that Mr. Justice Atkinson at page 433 refers to headnote 1 as follows: "The principle announced in the first headnote is so universally recognized that it is unnecessary either to cite authority for it or to state the reasons upon which the rule is based." This same statement of the rule was quoted by Bell, J., in *Moore* v. *Seaboard Air-Line Ry. Co.,* 30 *Ga. App.* 466 (118 S. E. 471). This court again quoted it in the recent cases of *McEntire* v. *Pangle,* 197 *Ga.* 414 (29 S. E. 2d, 503), and *Hardin* v. *Baynes,* 198 *Ga.* 683 (2-a) (32 S. E. 2d, 384). There are numerous decisions of this court to the same effect. It cannot now be reasonably asserted that as a matter of law a petition when considered on demurrer may be construed most favorably to the petitioner, as I believe the majority opinion does in the present case.

There can be no legal support for the ruling by this court to the effect that it is clearly implied that there has been no actual adoption by the fact that the petitioner has brought this action. If such were the law, a suit on a note which fails to allege maturity and non-payment must be sustained against a general demurrer, for in that case this court would imply that the note was due and unpaid from the simple action of the plaintiff in instituting a suit thereon. For the reasons stated, the general demurrer should have been sustained and the action dismissed unless amended to meet the grounds of the demurrer.

2. I am unable to concur in the ruling that the evidence sustains the verdict. An action for virtual adoption is an equitable substitute for an action for specific performance because of equities existing in favor of the petitioner which can not be protected by specific performance due to the death of the opposite party. *Crawford* v. *Wilson,* 139 *Ga.* 654 (supra). The evidence in such a case must be clear and convincing and must establish every essential of the definite contract alleged. This court, speaking through Beck, P. J., in *Crum* v. *Fendig,* 157 *Ga.* 528 (121 S. E. 825), after discussing the *Crawford* v. *Wilson* case, supra, said: "We are of the opinion that the decision made in the *Crawford* v. *Wilson* case is sound, but we do not think the ruling should be extended." In *Jones* v. *O'Neal,* 194 *Ga.* 49 (supra), this court held that an essential of a contract that would support a suit for virtual adoption is that the contract contains an agreement to

adopt. It seems to me that the interpretation by the majority of the testimony of the father, wherein he stated in substance that the Tolers were to take the minor as their child, and that it should inherit as their child, or "something like that," to mean an obligation upon the part of the Tolers to adopt, is out of harmony with the above rule. The majority opinion authorizes a recovery despite the undeniable fact that there was, according to the evidence, no definite and specific contract to adopt, and despite the fact that the evidence relied upon is vague, uncertain, and contradictory, whereas the rule would require that it be strong and convincing. *Salmon* v. *McCrary,* 197 *Ga.* 281 (supra). It is my opinion that recovery in a virtual-adoption proceeding should never be allowed unless the allegations and proof are sufficient to authorize a decree of specific performance of the contract were the parties living. An attempt to secure specific performance of the contract shown by this evidence would at the outset encounter an insurmountable obstacle of law, for the testimony of the father, taken in its most favorable light, and disregarding the contradictory portions, shows no more than that these parties agreed that the child would inherit as a child of the Tolers, despite the fact that the law would not permit it to so inherit and the parties to such contract did not see fit to embody therein a provision imposing upon the Tolers a duty to take affirmative action to adopt the child as provided by law. If by their contract they would not impose such an obligation, then a court should not amend the contract by imposing that obligation upon the Tolers. The decision of the majority in effect first reforms the contract as shown by the evidence by adding thereto an obligation to adopt, and then holds that such reformed contract was breached, and on account of this breach sustains recovery. If it be said that the parties to this alleged contract were unaware of the law providing for legal adoption, then it necessarily follows that they could not have intended to impose upon the Tolers a duty to legally adopt the minor. On the other hand, if it be conceded, as it must as a matter of law, that the parties were conclusively presumed to know the law and, hence, knew of the provision for legal adoption, they should have embodied in the contract an obligation of the Tolers to thus legally adopt. Their negligence, if such was their intention, in failing to embody this essential obligation in the contract, should not be excused by a court

of equity and a construction be placed thereon that would supply this admittedly absent essential provision.

HEAD, Justice, dissenting in part and concurring in part. I dissent from the ruling made in division 1 of the opinion on the demurrer and from the judgment of affirmance. I concur in all of the other rulings in the majority opinion.