Tammy L. DAVIS, an infant, by her father and next friend, Aulbra Davis, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Defendant.

Civ. A. No. 830.

United States District Court
S. D. West Virginia,
Bluefield Division.

March 25, 1965.

Marshall G. West, Pineville, W. Va., for plaintiff.

George D. Beter, Acting U. S. Atty., Charleston, W. Va., for defendant.

CHRISTIE, District Judge.

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A.

§ 405(g), to review a final decision of the Secretary of Health, Education, and Welfare. A decision rendered by a hearing examiner on March 27, 1964, became the final decision of the Secretary on May 14, 1964, when the Appeals Council denied plaintiff's request for review. The final decision holds that plaintiff is not entitled to child insurance benefits under Section 202(d) of the Social Security Act, 42 U.S.C.A., § 402(d), on the ground that the plaintiff was not, as claimed, the "child" of Aulbra Davis, the wage earner, within the meaning of Sections 216(e) and (h) of the Act, 42 U.S.C.A. § 416(e) and (h).

The facts in this case are undisputed and are as follows:

Ella Mae Davis, wage earner's unmarried daughter, gave birth to a girl at Clark's Clinic, Iaeger, West Virginia, on August 11, 1959. The child was given at that time, by the daughter, to wage earner and his wife, Hazel Davis, to raise. They named the child Tammy Lynn Davis and the birth certificate shows Tammy's father and mother to be the wage earner and his wife. The daughter and child were taken from the hospital to wage earner's home. From the date of Tammy's birth, wage earner and his wife were the sole providers of food, clothing, and medical care for the child. When Tammy was two months old, the daughter left her parents' home and went to Cleveland, Ohio, to get a job. She was gone for a period of almost two years.

The Davises raised the child as their own. Wage earner claimed Tammy as his daughter on the United Mine Workers Welfare card so that she would receive hospitalization benefits. Tammy addressed wage earner and his wife as "daddy" and "mommy."

On November 15, 1960, wage earner filed application for a period of disability and disability insurance benefits, alleging he became disabled in 1958 due to smothering spells, cough, blind staggers, shortness of breath, and limited use of both hands. The Social Security Administration found him disabled from engaging in any substantial gainful activity and thereby established a period of disability for him commencing on March 31, 1960, and entitlement to disability insurance benefits beginning on October 1, 1960. On June 23, 1961, the daughter returned to the home of her parents and remained there about nine or ten months. Her whereabouts from that time on were not brought out in the record except that her name, as of January 12, 1962, was Ella Mae Davis Taylor, and that as of March 4, 1964, she was living in Columbus, Georgia, under the name of Ella Mae Steele. On January 10, 1962, the daughter's consent was given to the adoption of Tammy by Mr. and Mrs. Davis. Tammy, then three years old, became legally adopted by wage earner and his wife on December 15, 1962, in the Circuit Court of Wyoming County.

On December 17, 1962, plaintiff filed application for child insurance benefits. This application was denied by the administration and is the present subject matter of litigation in this court.

Since the facts herein are not in dispute, the provision of Section 205(g) of the Act, 42 U.S.C.A. § 405(g), that the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, is not applicable here. Kilby v. Folsom, 238 F.2d 699, 60 A.L.R. 2d 1065 (3rd Cir. 1956); Miller v. Ribicoff, 209 F.Supp. 460 (E.D.Pa.1962). We are only concerned here with the legal conclusions to be drawn from the facts.

Consideration must be first given to the problem of whether the adoption of Tammy by the wage earner was within the period required under the statute. The controlling provision, 42 U.S.C.A. § 402(d), states:

"(d) (1) Every child * * * of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child—

"(A) has filed application for child's insurance benefits,

"(B) at the time such application was filed was unmarried and either (i) had not attained the age of eighteen or (ii) was under a disability * * * which began before he attained the age of eighteen, and

"(C) was dependent upon such individual—(i) if such individual is living, at the time such application was filed, * * *.

shall be entitled to a child's insurance benefit for each month, beginning with the first month after August 1950 in which such child becomes so entitled to such insurance benefits. * * * In the case of an individual entitled to disability insurance benefits, *the provisions of clause (i) of subparagraph (C) of this paragraph shall not apply to a child of such individual unless he * * * (B) was legally adopted by such individual before the end of the twenty-four month period beginning with the month after the month in which such individual most recently became entitled to disability insurance benefits, but only if * * * (ii) such adopted child was living with such individual in such month.*"
(Emphasis ours)

Applying this statute to the present case, it was found by the administration that wage earner most recently became entitled to disability insurance benefits on October 1, 1960. Thus, wage earner had from November 1, 1960 until November 1, 1962, in which to accomplish the adoption so that Tammy would become entitled to the child insurance benefits. However, the adoption was not completed until December 15, 1962, forty-five days after the expiration of the twenty-four month period. Based on these facts, it was the decision of the Secretary that wage earner had not complied with this section of the statute. We think that such was a proper interpretation of the statute.

The remaining issue for decision is whether Tammy, though not being qualified as a legally adopted child, may, nevertheless, qualify as a child by virtue of the concept of "equitable adoption" so as to come within the requirements of the statute. Section 216(e) of the Act, 42 U.S.C.A., 416(e), provides as follows:

"(e) The term 'child' means (1) the child or legally adopted child of an individual * * *."

And Section 216(h) (2) (A) of the Act, 42 U.S.C.A., 416(h) (2) (A), provides:

"In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this subchapter, the Secretary shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application, * * *."

The Secretary, in his brief, takes the position that there is no decision law in West Virginia which clearly defines the inheritance rights of an "equitably adopted child." He states,

"The Code of W. Va. sets forth procedures for adopting a child and there are no decided cases in West Virginia that indicate that, absent compliance with that State's statutes, a child can legally be considered the adopted child of another. Other states, however, generally recognize a child as the child of another on a theory known as equitable adoption, and since there is no decided case in West Virginia to the contrary, the Secretary is willing to apply this principle to this case in the interest of being as liberal as possible in the interpretation of the Social Security Act and to consider the child in this case as the child of the wage earner if the child could have qualified as such under the principle of equitable adoption in a state in which the principle is applied."

It is thus apparent that the Secretary has evolved the policy of conceding that the concept of "equitable adoption" would, when warranted by the facts, be applied

by the courts of West Virginia. This concession by the Secretary is found to be compatible with his duty to administer this social legislation in the broad framework of its humanitarian aim—to ameliorate economic hardship to the wage earner and those dependent upon him—and this court can see no reason to disagree therewith. Then, the question arises, is there found to exist in the facts of this case the essential ingredients requisite for the application of the doctrine to the claim asserted? This Court thinks so.

The necessary ingredients seem to require a written or oral agreement showing the intention of the parties to adopt and this contract or agreement must be proven by clear, strong and satisfactory evidence, Ware v. Martin, 209 Ga. 29, 70 S.E.2d 446; Toler v. Goodin, 200 Ga. 527, 37 S.E.2d 609, and a consideration. This may be the detriment to the parties surrendering the child, or change in the domestic status of the child, or the benefits in love and affection and services accruing to the adopting parties. Foster v. Cheek, 212 Ga. 821, 96 S.E.2d 545. Examining the facts in the light of these requirements, it is to be noted:

First, the birth certificate shows the father and mother to be the wage earner and his wife; custody, control and handling of the child was in wage earner and his wife from day of child's birth; the natural mother, within two months after birth, abandoned child, going to Cleveland, Ohio, and did not return for almost two years; the subsequent legal adoption by wage earner and his wife; and the statements, acts, and conduct of the parties involved, all compatible with abandonment of the child by the natural mother and the intent of wage earner and his wife to treat it as their own from its birth. It is well settled that an oral agreement to adopt may be shown by the acts, conduct and admissions of the parties. Toler v. Goodin, supra.

Defendant relies heavily on the statement of the natural mother made on April 18, 1963, to the administration, relating that she could have taken Tammy any time prior to the adoption. This statement was in apparent conflict with a statement made by her on March 4, 1964, in a handwritten letter in which she stated that she gave the baby to her mother at the clinic. The hearing examiner held, and we think correctly so, that the older statement was of more probative value since it was closer to the time of the legal adoption. (The statement was made approximately four months after the adoption). To follow the reasoning of the hearing examiner to its logical conclusion, it would be apparent that the statements made on or before the adoption would be of greater probative value in determining the existence of an oral agreement to adopt the child. Mrs. Collins, wage earner's niece, testified under oath at the hearing that she talked to the natural mother at wage earner's home shortly after the birth of Tammy and that the mother told her, concerning Tammy, "Well, I give it to my mother and daddy. It's Mommy's baby now." Mrs. Davis testified also under oath that she visited her daughter in the hospital following Tammy's birth and asked her what she was going to do about the baby and the daughter stated, "I don't know. If you want it you can have it." Mrs. Davis also testified that when Dr. Clark expressed a desire to take the baby the daughter replied, "No, I'm going to give the baby to Mommy." Even in the mother's statement on April 18, 1963, on which defendant relies, it is clear that an agreement had been reached by the parties within two months after Tammy's birth, that wage earner and his wife were to adopt the child. The daughter stated therein, "Mother said that she would continue keeping Tammy and that they would adopt Tammy when I came home from Ohio * * *. My mother was saving up money for the adoption." Thus, it would seem clear from the foregoing testimony that an agreement was reached for wage earner and his wife to adopt Tammy and that the formalities of such adoption were only prevented

from taking place earlier by the prolonged absence of the daughter in Ohio and by the lack of money to pay the costs of the adoption on wage earner's part. Moreover, regardless of any belief entertained by the natural mother that she could have taken her child at any time prior to consummation of legal adoption, it is to be seriously doubted if she, under the circumstances, could have done so, because of her apparent abandonment of the child. West Virginia Code, 48–4–1, provides that the consent of the natural parents is not required in an adoption proceeding where abandonment of the child is shown, and the West Virginia decisions are in accord, Hurley v. Hurley, 71 W.Va. 269, 76 S.E. 438; State ex rel. Lipscomb v. Joplin, 47 S.E.2d 221; Hoy v. Dooley, 144 W.Va. 64, 105 S.E.2d 877; 14 M.J., Parent and Child, Section 7. Then, too, the natural parent will be denied custody when it appears he is unfit for the trust. Stout v. Massie, 140 W.Va. 731, 88 S.E.2d 51; Pukas v. Pukas, 42 S.E.2d 11; State ex rel. Bennett v. Anderson, 129 W.Va. 671, 41 S.E.2d 241; Pierce v. Jeffries, 103 W.Va. 410, 137 S.E. 651, 51 A.L.R. 1502; Fletcher v. Hickman, 50 W.Va. 244, 40 S.E. 371, 55 L.R.A. 896; and Green v. Campbell, 35 W.Va. 698, 14 S.E. 212, 213. The question, therefore, of whether the natural mother could have regained custody of her child, after an absence from it of two years, was not her sole prerogative to decide. The intervening rights of the foster parents and the welfare of the child itself were important factors that would have required the most serious consideration, and only the courts could have made the ultimate decision.

Defendant further contends that the cases of King v. Secretary of Health, Education and Welfare of the United States, 224 F.Supp. 846 (D.C.N.Y.1964); Spiegel v. Flemming, 181 F.Supp. 185 (N.D.Ohio 1960); Miller v. Ribicoff, supra; and Minefield v. Railroad Retirement Board, 217 F.2d 786, 65 A.L.R.2d 994 (5th Cir. 1964) are applicable here. These cases are clearly distinguished from the one at bar. From a careful reading of the King, Miller and Minefield decisions, the fact that no formal or legal adoption ever took place within a reasonable time weighed heavily in the determination of the cases by the Court. As stated by Judge Rayfiel in the King decision,

"Nothing was done respecting the adoption for almost seven years when the plaintiff and her husband visited a lawyer to discuss the adoption with him. Even at that late date nothing was done. No agreement was drawn between the parties concerned, nor was application made to the Surrogate to formalize the adoption."

The Court then proceeded to emphasize the reason given by the plaintiff for failing to continue the adoption proceedings, being that while the daughter was willing to give up the child, "she didn't want to stir up her past with the child's father," as evidence of no agreement to adopt the child. Another distinguishing feature from our case pointed out by Judge Rayfiel in reaching his decision was,

"It must also be remembered that the Baptismal Certificate shows the child's name to be Stephanie Richardson and lists her mother and father to be Dorothy and Ellis Richardson." (King was the name of the parents seeking the equitable adoption).

In the Miller decision, the Court particularly referred to the lack of formal adoption as showing the intention of the parties,

"When the child was approximately a year and a half old, the Millers first asked Eugene McAndrew for permission to adopt her. This permission was refused. * * * The question of adoption was raised by the wage earner and his wife on subsequent occasions during the wage earner's lifetime, but Eugene McAndrew consistently refused to consent thereto. * * * The refusal to allow adoption of the child per-

sisted even after the death of the wage earner."

Also, as brought out in the Minefield case, "petitioner does not contend that * * * the employee *ever* adopted her in accordance with the laws on adoption of the State of Texas." (Emphasis ours)

The Spiegel decision deals completely with an unrelated situation. In that case, a child was placed in plaintiff's home by an adoption agency on a six-months' trial basis. The wage earner died within that period. As stated by the Court,

"At the time of the placement of the child it was explained to the wage earner and plaintiff that there would be a six-month waiting period before adoption could be undertaken; that during that period the social agency would 'service' the family; and if the family and child adjusted satisfactorily, legal adoption would be undertaken after the end of the six-month period."

This Court would agree that no agreement to adopt or equitable adoption took place within the six-months' period, but this case is a far cry from the case at bar.

Secondly, was there the required consideration: It goes without saying that the raising of the child by wage earner and his wife, accepting Tammy as their own daughter, was a significant change in the domestic status of the child. It gave her the status of legitimacy and relieved the mother of the burden of caring for and supporting her, the natural father having expressed no intention of doing so. Consideration, therefore, was definitely present.

So viewed, this Court is of the opinion that there was an oral agreement between the parties that Tammy was to be adopted and there being consideration for such an agreement, it constituted an "equitable adoption" under the liberal interpretation of the statute as contemplated by the Congress and as recognized by the Secretary, and that such "equitable adoption" took place within the required twenty-four months' period after wage earner became entitled to disability insurance benefits. Therefore, defendant's motion for summary judgment is hereby denied and plaintiff's motion for summary judgment is hereby granted; thus, entitling plaintiff to child insurance benefits.